**In re John W. FIDLER and Helen M. Fidler, Debtors**

**John W. FIDLER and Helen M. Fidler, Plaintiffs**

**v.**

**CENTRAL COOPERATIVE BANK, Defendant.**

**Bankruptcy No. 96–10678–WCH. Adversary No. 96–1270.**

United States Bankruptcy Court, D. Massachusetts, Eastern Division.

June 30, 1997.

414

Paul D. Gallese, Chuster, Sawyer & Brewster, P.A., Newton, MA, for Central Co-op. Bank.

John F. Cullen, Cullen & Cullen, Boston, MA, for debtors.

## DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

### I. *Introduction*

Plaintiffs John W. Fidler and Helen M. Fidler (the "Fidlers") brought this adversary proceeding against Defendant, Central Cooperative Bank ("Central") seeking, *inter alia,* a declaration that the secured claim asserted by Central is void and unenforceable. The matter before the Court is Central's Motion for Summary Judgment which is supported by affidavits. The Fidlers filed an objection to Central's motion and moved to strike the affidavit of John M. Evans ("Evans") attached to and incorporated by reference in Central's motion. I held a hearing on March 10, 1997 and took both the motion for summary judgment and the motion to strike under advisement. The following material facts are not in dispute, except as specifically noted below.

### II. *Procedural and Factual Background*

On January 24, 1980, the Fidlers purchased real property located at 6 Cross Street, Charlestown, Massachusetts (the "Property"). It is their primary dwelling.

In December 1983, they refinanced the Property, borrowing $32,500 from Central,[1] secured by a first mortgage. In May 1986,[2] the Fidlers refinanced the 1983 loan. In that transaction, the Fidlers borrowed $42,000 from Central and granted a replacement mortgage in that amount. In March 1987, the Fidlers obtained an additional loan of $35,500 from Bedford Mortgage Corp. ("Bedford") which was secured by a second mortgage on the Property.

In August 1987, the Fidlers entered into negotiations with Central to refinance the mortgages on the Property. By letter dated September 16, 1987 (the "Rate Letter"), Central advised the Fidlers that it was "agreeable" to fund an $80,000 loan on the following terms: [3]

> Term: 30 years
>
> Type: 3 year adjustable
>
> Rate: 9.50%

The Rate Letter further provided that the Fidlers could "secure the rate" until November 1, 1987 by paying Central $400 on or before September 23, 1987. On September 21, 1987, the Fidlers paid $400 to Central to secure an interest rate of 9.5% for their loan.[4]

By letter dated September 22, 1987, Central confirmed that the Fidlers had "locked in" the 9.5% rate and asked them to complete certain "verification forms" and to pay an "application fee" of $275. Enclosed with the letter were a Federal Truth–In–Lending Disclosure Statement ("September TILA Statement") and a Good Faith Estimate of Settlement Costs. The September TILA Statement indicated that the annual percentage rate and finance charge for the loan were 11.07% and $198,991.32, respectively.

The Fidlers contend that shortly thereafter they notified Central that both documents erroneously reflected an interest rate for their loan of 9.75% rather than 9.5%. In addition, they contend that an unidentified employee at Central told them that they would receive a corrected truth-in-lending statement and estimate of settlement costs upon payment of the application fee to Central. The Fidlers further allege that the employee instructed them to sign the September TILA Statement to avoid "slow[ing] down the process." On September 23, 1987, the Fidlers signed the September TILA Statement and paid $275 to Central.

On September 30, 1987, Central requested that the Fidlers execute a loan application which had been typed by a Central employee. At that time, the Fidlers allege that they requested a corrected truth-in-lending statement from Central. They further contend that a Central employee instructed them to sign the loan application and told them that Central would issue them a new truth-in-lending statement after the bank received their signed application.

On October 7, 1987, Central issued the Fidlers a Mortgage Loan Commitment (the "Commitment Letter"). The Commitment Letter advised the Fidlers that their loan application was approved, subject to certain conditions. In addition, the Commitment Letter indicated the annual percentage rate for the transaction was 11.16%.

The refinancing transaction closed on October 21, 1987. At the closing, Fidlers executed an Indexed Adjustable Rate Mortgage Note ("Note") in the principal amount of $80,000 and granted Central a first mortgage on the Property ("Mortgage"). The initial contract rate of interest for the Note was 9.5%. The Note also provided for automatic adjustments to this initial contract rate every three years during the term of the loan. In addition, the Note provided in relevant part that:

> Not less than thirty (30) nor more than (60) days prior to each Adjustment Date, the Borrower will receive a written notice (the "Adjustment Notice" specifying (i) the interest rate at which this Note will be

---

1. Central, in its papers, incorrectly identifies the loan amount as $32,000.

2. Central incorrectly identifies the date of this loan as May 15, 1987.

3. The Rate Letter also provided, in relevant part that: "this does not constitute a commitment to the loan but only to the rate".

4. Central incorrectly identifies the interest rate as 9.0%.

continued and an explanation of any rate adjustment, (ii) the monthly installment to be paid until the next Adjustment Date as calculated by the interest rate applicable for such period, and such other information as may be required from time to time under applicable laws or regulations.

At the closing, the Fidlers contend that a secretary from Central's closing attorney's office presented them with another truth-in-lending statement (the "October TILA Statement"). The October TILA Statement indicated that the annual percentage rate and finance charge for the loan for the were 11.43% and $210,249.90, respectively. The Fidlers further allege that the secretary instructed them to sign but not date the October TILA Statement. In addition, they contend that Central did not furnish them with a copy of the October TILA Statement at the closing.

Pursuant to the terms of the Note, the interest rate applicable to the loan was adjusted in 1990 and 1993. The Fidlers contend that Central failed to provide them with an Adjustment Notice prior to the 1990 interest rate adjustment.

The Fidlers defaulted on a number of payments under the Note and on September 1, 1995 entered into negotiations with Central's Collection Manager, Daniel Berberian ("Berberian"), regarding a forbearance agreement. Berberian requested that the Fidlers furnish Central with a workout proposal and their federal income tax returns for 1993 and 1994. On September 5, 1995, however, counsel for Central sent the Fidlers a Notice of Intent to Foreclose.

On September 25, 1995, the Fidlers sent Central a demand letter pursuant to the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A (" Demand Letter"). In the Demand Letter, the Fidlers requested reimbursements and credits in connection with their loan payments to Central and their obligations under the Note. Subsequently, on November 30, 1995, the Fidlers sent Central a notice purporting to rescind the 1987 loan transaction with Central pursuant to the federal Truth–in–Lending Act, 15 U.S.C. §§ 1601–1667 ("TILA") and the Massachusetts Consumer Cost Disclosure Act, Mass. Gen. Laws ch. 140D, §§ 1–35 ("CCCDA" and the "Rescission Notice," respectively). In the Rescission Notice, the Fidlers demanded that Central, inter alia, return all interest and principal payments paid under the Note from December 1; 1987 to July 1, 1995 and take all steps necessary to terminate the Mortgage.

On January 31, 1996, the Fidlers commenced a case under Chapter 13 of the Bankruptcy Code, 11 U.S.C. § 101, et seq. and filed their Chapter 13 Plan. On March 14, 1996, Central filed an Amended Proof of Claim for a secured claim in the amount of $89,633.08. On March 25, 1997, Central filed an opposition to the Fidlers' plan contending that the plan did not provide for full payment of its secured claim. On April 1, 1996, Central moved for relief from stay to foreclose its mortgage on the Property. The Fidlers filed a response to Central's objection to their plan and an opposition to Central's motion for relief from stay in which they contend, inter alia, that they effectively rescinded Central's mortgage on the Property pursuant to TILA and CCCDA. The hearings on Central's objection to the Fidlers' plan and motion for relief from stay were continued with the consent of the parties until resolution of the Fidlers' defenses under TILA and CCCDA.

On June 4, 1996, the Fidlers commenced the present adversary proceeding by filing an "Adversary Complaint to Determine Validity And/Or Extent of Secured Claim" (the "Complaint"). In their Complaint, the Fidlers allege that Central violated TILA and CCCDA.[5] Specifically, they complain that:

1) The September TILA Statement understated, inter alia, the finance charge, annual percentage rate and payment schedule for the loan;

2) Central failed to make appropriate disclosures regarding the circumstances un-

---

**5.** In Counts 3 and 10 of the Complaint, the Fidlers also assert that Central violated the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, et seq. ("RESPA"). In their opposition, however, the Fidlers failed to identify or discuss Central's alleged RESPA violations.

der which the interest rate for the loan could increase;

3) Central failed to notify them prior to the loan closing of increases in the index applicable to interest rate adjustments under the Note;

4) Central failed to make appropriate truth-in-lending disclosures prior to the 1990 interest rate adjustment; and

5) Central failed to furnish them with certain "mathematical calculations" prescribed under Massachusetts law in connection with the interest rate adjustments in 1990 and 1993.

In addition, the Fidlers allege that Central's misrepresentations regarding the terms and conditions of the 1987 transaction and conduct in connection with workout negotiations in 1995 constitute "unfair and deceptive acts or practices" within the meaning of Mass. Gen. Laws. ch. 93A, § 2 and support common law claims for intentional misrepresentation, negligence and unconscionability. Through the Complaint the Fidlers seek the following relief: 1) a declaration that the 1987 transaction was rescinded in 1995 and that the Mortgage is void and unenforceable; 2) disallowance of Central's claim in its entirety; 3) an order compelling Central to return all sums paid under the Note; 4) statutory damages under TILA in the amount of $2,000; and 5) damages for Central's violations of Mass. Gen. Laws ch. 93A and for misrepresentation, negligence and unconscionability.

## III. The *Position of the Parties*

### A. Central

In support of its motion for summary judgment, Central first contends that the Fidlers claims for rescission and damages under TILA and CCCDA are barred by the four year statute of limitations set out in Mass. Gen. Laws ch. 140D and Mass. Gen. Laws ch. 260. Sensitive to the body of authority which distinguishes between the affirmative and defensive assertion of truth-in-lending claims for limitation purposes, Central also argues that the Fidlers claims are time barred because they are being asserted affirmatively rather than as claims in recoup-

ment. Alternatively, Central contends that even if the Fidlers' claims for rescission are timely only the new money advanced in the 1987 transaction is subject to rescission. In support of its contention, Central relies on the partial exemptions from rescission under TILA and CCCDA applicable to refinancing transactions. In addition, Central contends that it is entitled to summary judgment on the Fidlers' truth-in-lending claim because it complied with TILA and CCCDA. In support of this contention, Central relies principally on the Affidavit of Evans.

In addition, Central contends that it is entitled to summary judgment on the Fidlers' claims under Mass. Gen. Laws ch. 93A. First, it contends that the claims are time barred. Alternatively, it seeks summary judgment based on its asserted compliance with TILA and CCCDA. Finally, Central asserts that the Fidlers have not alleged sufficient facts to support their common law claims.

### B. The *Fidlers*

In opposition, the Fidlers contend that their claims for rescission and damages under TILA and CCCDA are not barred by the statute of limitations because they are being asserted defensively. In support of this contention, they rely on the case law which holds that statutes of limitations do not bar truth-in-lending claims brought as claims in recoupment and on recent amendments to TILA. The Fidlers concede that their claim for rescission is subject to TILA's and CCCDA's refinancing exemption. They contend, however, that Central's failure to advise them that their right of rescission was limited by the refinancing exemption violated TILA and CCCDA. With respect to Central's contention that it is entitled to summary judgment on each of their truth-in-lending claims, the Fidlers contend, *inter alia,* that Evans is not competent to opine as an expert on Central's compliance with TILA and CCCDA. Alternatively, they contest Evans specific conclusions regarding Central's truth-in-lending disclosures.

In opposition to Central's motion for summary judgment on their claims under Mass. Gen. Laws ch. 93A, the Fidlers assert, *inter*

*alia,* that their claims are timely because they could not have reasonably discovered Central's TILA and CCCDA violations until the fall of 1995, at the earliest. The Fidlers also rely on their arguments that Central has not demonstrated that its compliance with TILA and CCCDA. Finally, as more particularly described below, the Fidlers contest Central's assertion that they failed to allege sufficient facts to support their common law claims.

## IV. *Discussion*

### A. *Summary Judgment Standard*

Fed.R.Civ.P. 56, made applicable to adversary proceedings by Fed. R. Bankr.P. 7056, governs motions for summary judgment. It provides that

> "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The burden of proof is upon the moving party in the first instance. *In re Wang Laboratories, Inc.,* 155 B.R. 289, 290 (Bankr. D.Mass.1993). To defeat the motion, the opposing party must produce substantial evidence of a genuine dispute as to a material fact. *Darr v. Muratore,* 8 F.3d 854, 859 (1st Cir.1993); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Federal Deposit Insurance Corp. v. Anchor Properties,* 13 F.3d 27, 30 (1st Cir.1994) (quoting *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir. 1993)).

In making its determination, the court must view the facts and draw inferences in the light most favorable to the party opposing the motion, and must indulge all inferences favorable to that party. *Morris v.*

*Government Development Bank,* 27 F.3d 746, 748 (1st Cir.1994 *); Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988). Summary judgment must be denied if inferences necessary to the judgment are not mandated by the record. *See Blanchard v. Peerless Ins. Co.,* 958 F.2d 483, 488 (1st Cir.1992) (summary judgment is precluded "unless no reasonable trier of fact could draw any other inference from the 'totality of the circumstances' revealed by the undisputed evidence").

In addition, Fed.R.Civ.P. 56 permits entry of summary judgment in favor of a nonmoving party even in the absence of a formal cross motion under the rule. *National Expositions v. Crowley Maritime Corp.,* 824 F.2d 131, 133 (1st Cir.1987).

### B. *The Fidlers' Truth–in–Lending Claims*

#### 1. *Statute of Limitations*

##### a. *Introduction.*

Central contends that the Fidlers' claims for damages and rescission under TILA and CCCDA are barred by the statute of limitations. It is undisputed that the applicable statute of limitations for the Fidlers' state and federal truth-in-lending claims is four years as set forth in Mass. Gen. Laws ch. 140D, § 10(f) and ch. 260, § 5A.[6] The parties vigorously contest, however, whether the statute of limitations prevents the Fidlers from asserting their truth-in-lending claims defensively. Relying principally on *Botelho v. Citicorp Mortgage (In re Botelho),* 195 B.R. 558 (Bankr.D.Mass.1996) and on recent amendments to TILA, the Fidlers contend that truth-in-lending claims asserted defensively, as claims in recoupment are not subject to the four year statute of limitations. In opposition, Central contends that the statute of limitations applicable to claims for rescission under TILA and CCCDA operates as a statute of repose and, accordingly, rescission claims may not be revived as a defense in recoupment beyond the four year

---

6. Generally speaking, TILA claims arising from Massachusetts credit transactions are subject to CCCDA's statutes of limitations. *See Botelho v. Citicorp Mortgage (In re Botelho),* 195 B.R. 558, 565 (Bankr.D.Mass.1996); *Myers v. Federal Home Loan Mortgage Co. (In re Myers),* 175 B.R. 122, 125–6 (Bankr.D.Mass.1994).

expiration period. In support of this contention, Central relies on a case recently decided by the Florida Supreme Court, *Beach v. Great Western Bank,* 692 So.2d 146 (1997).

Alternatively, Central contends that the Fidlers' truth-in-lending claims do not constitute *bona fide* claims in recoupment. In support of this contention, Central argues that the instant adversary proceeding constitutes an "independent action" rather than a defensive counterclaim. In addition, Central distinguishes between its purported truth-in-lending violations and the Fidlers' loan defaults and argues that the Fidlers truth-in-lending claims do not arise out of the same transaction as the pre-bankruptcy foreclosure proceedings on the Property and Central's assertion of a secured claim in the Chapter 13 case.

*b. The Statute of Limitations Applicable to Claims in Recoupment*

Both TILA and CCCDA have explicit provisions which address the timeliness of claims for damages and rescission asserted as claims in recoupment. Claims for damages under TILA are subject to § 1640, which provides in relevant part:

> Any action under this section may be brought ... within one year from the date of the occurrence of the violation. *This subsection does not bar a person from asserting a violation of this subchapter in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law ....*

15 U.S.C. § 1640(e) (emphasis supplied).

Claims for rescission under TILA are governed by § 1635. It provides that a right of rescission "shall expire three years after the date of consummation of the transaction." 15 U.S.C. § 1635(f). Until 1995, § 1635, in contrast with § 1640, did not contain an ex-

plicit exemption from this expiration period for claims asserted defensively. Despite the absence of an explicit provision addressing claims in recoupment, a number of courts held that § 1635's three year statute of limitations was not applicable to rescission claims that were asserted as claims in recoupment. *See In re Botelho,* 195 B.R. at 566–567 (discussing the relevant authority). Other courts, however, inferred that the omission from § 1635 was deliberate and held that rescission claims asserted as claims in recoupment were subject to the statute of limitations. *See Beach,* 692 So.2d at 148.

Congress settled the argument in 1995 by adding subsection (i) to § 1635. It provides, in relevant part:

**(i) Rescission rights in foreclosure**

**(3) Right of recoupment under State law**

*Nothing in this subsection affects a consumer's right of rescission in recoupment under State law.*

**(4) Applicability**

This subsection shall apply to all consumer credit transactions *in existence* or consummated on or after September 30, 1995.

15 U.S.C. § 1635(i) (emphasis supplied).[7]

Notwithstanding the 1995 amendments to TILA, the Florida Supreme Court in *Beach* held that § 1635(f) operates as a statute of repose and bars even claims in recoupment beyond the statutory expiration period. *Beach's* holding, however, is premised on the finding that § 1635, in contrast with § 1640, does not contain a "savings clause" for claims in recoupment. *Id.* at 151–152. I respectfully disagree with *Beach's* construction of § 1635. Section 1635(i)(3) constitutes an explicit "savings clause" applicable to claims in recoupment.[8]

In light of the foregoing, whether the Fidlers truth-in-lending claims are timely depends on the statute of limitations applicable

7. In addition, in 1996, the General Court made virtually identical amendments to Mass. Gen. Laws ch. 140D, § 10 which governs claims for rescission under CCCDA. *See* Mass. Gen. Laws ch. 140D, §§ 10(i)(3) and (i)(4). CCCDA also has an explicit exemption from the statute of limitations for damage claims asserted "as a defense or counterclaim to an action to collect amounts owed by the consumer." Mass. Gen. Laws ch. 140D, § 32(g).

8. Curiously, although the 1995 amendments to TILA are discussed in a footnote, *Beach* does not discuss § 1635(i)(3). *See Beach* at 149 n. 6.

to claims in recoupment under Massachusetts law. On that issue, I agree with and adopt the analysis of Massachusetts law set forth in *Botelho,* where Judge Feeney held that claims in recoupment are subject to Mass. Gen. Laws ch. 260, § 36. That statute provides, in relevant part:

> [A] counterclaim arising out of the same transaction or occurrence that is the subject matter of the plaintiff's claim, to the extent of the plaintiff's claim, may be asserted without regard to the provisions of law relative to limitations of actions.

### c. *The Nature of the Fidlers' Claims*

 "[R]ecoupment is in the nature of a defense arising from some feature of the transaction upon which the plaintiff's action is grounded." *Bull v. United States,* 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). "As developed at common law, the doctrine of recoupment permits the crediting of reciprocal rights against each other where those rights arose under the same transaction, typically the same contract." *Mohawk Industries, Inc. v. United States of America (In re Mohawk Industries, Inc.),* 82 B.R. 174, 176 (Bankr.D.Mass.1987). To demonstrate that a claim is being asserted in recoupment the following elements must be established: "(1) The TILA violation and the creditor's debt arose from the same transaction, (2) [The claimant] is asserting her claim as a defense, and (3) the 'main action' is timely." *Smith v. American Financial Systems, Inc. (In re Smith),* 737 F.2d 1549, 1553 (11th Cir.1984). *See also Coxson v. Commonwealth Mortgage Co. of America, L.P. (Matter of Coxson),* 43 F.3d 189, 193 (5th Cir.1995); *In re Botelho,* 195 B.R. 558, 563 (Bankr.D.Mass.1996).

 Central's contention that the Fidlers are not asserting their claims under TILA and CCCDA defensively is without merit. It relies on the merely formal distinction between asserting a counterclaim as a defendant in a civil action and the commencement of an adversary proceeding to test the validity of a creditor's claim. I find that the Fidlers raised their truth-in-lending claims defensively in response to Central's assertion of a secured claim and filing of a motion for relief from stay to foreclose on the Property

in the Chapter 13 case. *Matter of Coxson,* 43 F.3d 189, 194 (5th Cir.1995); *In re Botelho,* 195 B.R. 558, 563 (Bankr.D.Mass.1996); *Shaw v. Federal Mortgage & Investment Corp. (In re Shaw),* 178 B.R. 380, 387 (Bankr.D.N.J.1994). In addition, Central's distinction between its purported truth-in-lending violations and the Fidlers' loan defaults is similarly artificial. Central's secured claim and the Fidlers' loan defaults both arise from the same transaction, the 1987 refinancing. *Id.*

In light of the foregoing, I find that the Fidlers' truth-in-lending claims are timely.

### 2. *The Refinancing Exemption under TILA & CCCDA*

 Both TILA and CCCDA partially exempt refinancing transactions from rescission. In particular, TILA exempts:

> a transaction which constitutes a refinancing or consolidation (with no new advances) of the principal balance then due and any accrued and unpaid finance charges of an existing extension of credit by the same creditor secured by an interest in the same property.

15 U.S.C. § 1635(e)(2).

The regulations promulgated under § 1635 further define the scope of TILA's refinancing exemptions. They provide, in relevant part:

> (f) Exempt transaction. The right to rescind does not apply to the following:
>
> (2) A refinancing or consolidation by the same creditor of an extension of credit already secured by the consumer's principal dwelling. The right of rescission shall apply, however, to the extent the new amount financed exceeds the unpaid principal balance, any earned unpaid finance charge on the existing debt, and amount attributed solely to the costs of refinancing or consolidation.

12 C.F.R. § 226.23(f).

The Third Circuit has aptly summarized the purpose of this exemption:

> The exemption has a rather simple rationale. Although in general consumer borrowers need a "cooling off" period to reconsider encumbering the title to their

homes, a borrower who refinances has already had the time to rethink with respect to the old money. The borrower may want to reconsider further indebtedness, as that constitutes an additional risk of losing his or her home, but Congress evidently felt that it would be unfair to lenders if, simply by the expedient of seeking refinancing for the same amount, borrowers could gain the right to cancel the earlier loan. In short, although the general requirement of notification and opportunity to rescind protects borrowers, the statutory exemption for "refinancings" avoids overprotecting them at the expense of lender.

*Porter v. Mid–Penn Consumer Discount Co. (In re Porter)*, 961 F.2d 1066, 1074 (3rd Cir.1992).

The regulations promulgated under CCCDA provide for a substantially similar exemption applicable to refinancing transactions:

> The right of rescission does not apply to ... [a] refinancing or consolidation by the same creditor of an extension of credit already secured by the consumer's principal dwelling. If the new amount financed exceeds the unpaid principal balance plus any earned unpaid finance charge on the existing debt, this applies only to the existing debt and its security interest.

209 C.M.R. § 32.23(6)(b).

Accordingly, Central claims that, *at most*, the Fidlers' right to rescind the 1987 transaction extends only to the "new money" extended to the Fidlers. *In re Porter*, 961 F.2d 1066 (3rd Cir.1992). I agree.

The Fidlers admit that the refinancing exemption applies to the 1987 transaction. In their opposition, however, they contend that

Central violated TILA by not furnishing them with adequate notice of their limited right of rescission in the transaction. *See* 15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(b)(2). *See also In re Porter*, 961 F.2d 1066 (3rd Cir.1992); *In re Botelho*, 195 B.R. 558 (Bankr.D.Mass.1996). The Fidlers, however, have not plead this theory and, accordingly, the issue raised in their opposition of whether they received adequate notice of their rescission rights is not properly before the Court.[9]

### 3. The Merits of the Fidlers' Truth–In–Lending Claims

#### a. Introduction

Central also contends that its disclosures to the Fidlers regarding the 1987 refinancing complied with TILA and CCCDA. In support of this contention, Central relies principally on the Affidavit of Evans (the "Affidavit"). In the Affidavit, Evans avers, *inter alia*, that he recalculated the numerical disclosures contained in the September and October TILA Statements. Based on this analysis, he contends that Central's original disclosures were accurate and consistent with TILA and the regulations and interpretations promulgated by the Federal Reserve Board (the "Board") to implement TILA.[10] In addition, Evans avers that he examined Central's non-numerical disclosures in the September and October TILA Statements concerning the circumstances under which the interest rate charged under the Note could increase. He concludes that Central employed the appropriate model disclosures promulgated by the Board and, therefore, complied with TILA. Finally, Evans asserts that the 1990 and 1993 Adjustment Notices complied with TILA's disclosure standards.

---

**9.** In its memorandum, Central incorrectly asserts that in Count 11 of the Complaint the Fidlers allege that Central failed to adequately disclose that their right of rescission was limited by to the new money advanced in the transaction. As discussed previously, this theory was not alleged in the Complaint and, accordingly, Central's request for summary judgment on this issue is denied.

**10.** To implement TILA, Congress "delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit." *Ford Motor*

*Credit Co. v. Milhollin*, 444 U.S. 555, 560, 100 S.Ct. 790, 794, 63 L.Ed.2d 22 (1980). The Board has issued Regulation Z and the Official Staff Commentary, 12 C.F.R. Part 226, Supp. I (the "Commentary") interpreting Regulation Z. Regulation Z and the Commentary are entitled to substantial deference and are dispositive "absent some obvious repugnance to the statute." *Anderson Brothers Ford v. Valencia*, 452 U.S. 205, 219, 101 S.Ct. 2266, 2274, 68 L.Ed.2d 783 (1981). *See also Sentinel Fed. Sav. and Loan Ass'n. v. Office of Thrift Supervision*, 946 F.2d 85 (8th Cir.1991).

The Fidlers challenge Evans' competency to testify as to Central's compliance with TILA and CCCDA and the legal basis of his opinion. They move to strike the Affidavit in its entirety. Alternatively, the Fidlers take issue with Evans' specific conclusions regarding Central's disclosures and contend that summary judgment is inappropriate.

### b. *The Motion to Strike the Affidavit of John Evans*

Fed.R.Civ.P. 56(e), made applicable to adversary proceedings by Fed. R.P. Bankr.7056 governs the form of affidavits submitted in support of motions for summary judgment. It provides, in relevant part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

 The use of opinion evidence in the form of an affidavit is also appropriate to support a motion for summary judgment. *PNC Bank v. Liberty Mut. Ins. Co.*, 912 F.Supp. 169, 177 (W.D.Pa.1996). Only opinion testimony that would be admissible at trial, however, may be considered. Accordingly, a court must disregard an expert affidavit where the affidavit is "essentially conclusory" and lacks specific facts. *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1144 (3d Cir.1990) (quoting *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir.1985)). *See also Mapco, Inc. v. Carter*, 573 F.2d 1268,-1282 (Em.App.1978), *cert. denied*, 437 U.S. 904, 98 S.Ct. 3090, 57 L.Ed.2d 1134 (1978). In addition, a trial court has broad discretion to rule on the admissibility of the expert's evidence. *Washington v. Armstrong World Industries, Inc.* 839 F.2d 1121, 1123 (5th Cir.1988); *Crawford v. Worth*, 447 F.2d 738, 740–41 (5th Cir.1971). It may inquire into the reliability and foundation of any expert's opinion to determine its admissibility. *Soden v. Freightliner Corp.*, 714 F.2d 498, 502–503 (5th Cir.1983). Finally, it is within the Court's discretion to both strike portions of an affidavit which do not conform to the standards of Rule 56(e) and to preserve those portions of those portions of the affidavit which would be admissible at trial. 11 Jeffrey W. Stempel, *Moore's Federal Practice* § 56.14[l][d] (1997).

 The Fidlers move to strike the Affidavit in its entirety. First, they contend that Evans' lack of "formal training" and admitted unfamiliarity with CCCDA disqualifies him as an expert. Similarly, the Fidlers attack the basis of Evans opinion. Specifically, they contend that their 1987 refinancing with Central is subject to CCCDA's rather TILA's disclosure requirements. Accordingly, they argue that Evans' reliance on TILA, Regulation Z and the Commentary demonstrate that his conclusions are without merit and should be stricken.

 The Fidlers' challenge to the Evans' competency to testify as an expert because he lacks formal training is without merit. Generally speaking, professional education is not a prerequisite to qualify as an expert witness. One can qualify as an expert witness based upon practical experience as well. *Southern Cement Co. v. Sproul*, 378 F.2d 48, 49 (5th Cir.1967). *See also Grain Dealers Mut. Ins. Co. v. Farmers Union Coop. Elevator & Shipping Assn.*, 377 F.2d 672, 679 (10th Cir.1967). Evans' *curriculum vitae* indicates that he has a B.S. in education and has been employed for the last 16 years by Federal Publishing Company ("FPC") which is in the business of performing the financial calculations required under TILA for banks, financial institutions and other lenders. Evans' current responsibilities as a Senior Analyst and Project Director of Mortgage Origination Software include designing and upgrading software furnished to lenders which calculates the annual percentage rate, finance charge and other numerical disclosures required under TILA. In addition, Evans avers that he is "familiar with all the mortgage related aspects of Regulation Z." In light of Evans' experience at FPC, I find that he is qualified to give expert testimony regarding the calculation of the numerical disclosures required under TILA.

Similarly, the Fidlers' attempts to disqualify Evans' testimony based on his lack of familiarity with CCCDA must fail. TILA is relevant to Central's disclosure obligations to

the Fidlers. The Fidlers correctly point out that credit transactions subject to CCCDA are formally exempt from many of TILA's disclosure requirements. *See* 48 Fed.Reg. 14882, 14890 (April 6, 1983). This exemption, however, *does not extend* to disclosures of the finance charge or annual percentage rate in credit transactions. 15 U.S.C. § 1610(a); 12 C.F.R. § 226.28(b). Further CCCDA and the regulations promulgated by the Massachusetts Division of Banks and Loan Agencies to implement CCCDA, 209 C.M.R. § 32.00, *et seq.*, "essentially mirror the provisions of TILA and Regulation Z." *In re Botelho*, 195 B.R. 558, 565 (Bankr.D.Mass. 1996); *See also Whitley v. Rhodes Financial Services, Inc. (In re Whitley)*, 177 B.R. 142, 147 ( Bankr.D.Mass.1995); *Lynch v. Signal Finance Co. of Quincy*, 367 Mass. 503, 505, 327 N.E.2d 732 (1975). In particular, as set forth below, CCCDA has adopted TILA's requirements in connection with the initial, non-numerical disclosures required for variable rate loans and the notices regarding subsequent adjustments to the interest rate in such transactions. Finally, pursuant to the regulations promulgated to implement CCCDA, 209 C.M.R. § 32.00, *et seq*, compliance with the provisions of TILA which do not conflict with CCCDA is deemed to be compliance with CCCDA. 209 C.M.R. § 32.27.

In light of the foregoing, the Fidlers motion to strike the Affidavit is denied. Each of the Fidlers' truth-in-lending claims are addressed separately below.

### c. Count 1—The September TILA Statement

In Count 1, the Fidlers allege that Central misstated, *inter alia,* the annual percentage rate [11] and finance charge [12] for the 1987 transaction in the September TILA Statement. In particular, they allege that the annual percentage rate and finance charge disclosed in the September TILA Statement are premised on erroneous assumptions regarding the appropriate initial interest rate and "index value" for the transaction. In addition, they allege that the $275 they paid to Central in connection with the transaction was mistakenly characterized as an "application fee" and improperly excluded from the calculation of the finance charge for the loan. Finally, the Fidlers allege that Central failed to adequately disclose in the September TILA Statement the circumstances under which the interest rate for the loan could increase.

As adverted to previously, Central contends that Evans' Affidavit conclusively demonstrates its entitlement to summary judgment. I disagree. Evans' calculations are based on an incorrect assumption regarding the initial interest rate for the loan and assume facts in issue. In addition, as set forth below, I find that the September TILA Statement inaccurately characterizes the index applicable to the loan and fails to describe the loan's interest rate adjustment formula in a reasonably understandable format.

The parties correctly characterize the loan from Central to the Fidlers as a "discounted variable rate loan." The Eighth Circuit has succinctly defined such transactions, as follows:

> A "variable rate loan" is one in which different interest rates apply to different periods of time or to different portions of the principal balance. The differing rates are typically based on an index or formula.... In a discounted variable rate loan, the creditor sets a low "teaser" interest rate for the initial period for a long term loan; the index or formula is then used to establish the interest rate after this initial period.

*Sentinel Fed. Sav. and Loan Ass'n v. Office of Thrift Supervision,* 946 F.2d 85, 87 (8th Cir.1991) (citation omitted).

---

**11.** Regulation Z defines "annual percentage rate" as "a measure of the cost of credit, expressed as a yearly rate that relates the amount and timing of value received by the consumer to the amount and timing of payments made." 12 C.F.R. § 226.22(a).

**12.** Regulation Z defines "finance charge" as "the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4.

The Note provides for interest rate adjustments, every three years, during its 30 year term based on the following formula:

The interest rate variation at each Adjustment Date shall be determined by adjusting the interest rate, up or down, to a rate equal to the sum of the following index as most recently published prior to the Rate Setting Date which Rate Setting Date shall be 45 days prior to the Adjustment Date, plus 3 percentage points: [t]he weekly average yield on United States Treasury Securities adjusted to a constant maturity of 3 years as published by the Federal Reserve Board in Selected Interest Rates Publication H15.

In addition, the Note "caps" interest rate adjustments, as follows:

[T]he interest rate for the period after any Adjustment Date shall vary, up or down, from the interest rate of the immediately preceding period by not more than 2% per annum ... the interest rate shall not vary, up or down, more than 6% percentage points from the initial contract rate of interest during the term of this Note.

Finally, the initial interest rate of 9.5% is a discounted rate. It was not determined by reference to the Note's adjustment formula but was separately negotiated by the parties.

The Board has adopted specific disclosure rules for discounted variable rate loans. They provide, in relevant part:

i. When creditors use an initial interest rate that is not calculated using the index or formula for later rate adjustments, the disclosures should reflect a composite annual percentage rate based on the initial interest rate for as long as it is charged and, for the remainder of the term, the rate that would have applied using the index or formula at the time of consummation. The rate at consummation need not be used if a contract provides for a delay in the implementation of changes in an index value. For example, if the contract specifies that rate changes are based on the index value in effect during the 45 days before the change date, creditors may use any index value in effect during the 45 day period before consummation in calculating a composite annual percentage rate.

ii. The effect of the multiple rates must also be reflected in the calculation and disclosure of the finance charge, total payments, and payment schedule.

12 C.F.R. Part 226, Supp I, ¶ 17(c)(1), Comment 10.

Evans describes the procedures he employed to verify the September TILA Statement, thusly:

As of September 22, 1987 the Interest Rate for the proposed loan was 9.75% ... Using our most recent Mortgage Origination program I duplicated the September of 1987 Central Cooperative Bank 3–Year ARM definition as I understand it, including 2.00 % periodic caps and 6.00% lifetime caps and 3.00% margin. I set the index rate to 8.41%, set the APR method to U.S. Rule, the closing date to 11/02/87 and first payment date to 01/01/88. By setting the loan to $80,000 and including 1 point I effectively recreated the parameter conditions as they existed in September 1987.

The Fidlers contends that Evans' analysis is premised on, at least, two faulty assumptions:

1) the applicable initial interest rate for their loan was 9.75%; and

2) 8.41% was an appropriate index rate to use in connection with the disclosures contained in the September TILA Statement.

They further contend that these errors necessarily resulted in incorrect disclosures regarding the annual percentage rate, finance charge, total payments and payment schedule for their loan.

First, I shall address the issue of whether 8.41% was an appropriate index value to use in calculating the annual percentage rate, finance charge and other numerical disclosures in the September TILA Statement. The Three Year Treasury Index for the weeks of September 8, 1987; September 14, 1987 and September 21, 1987 was 8.41%, 8.70% and 8.64%, respectively. The Fidlers allege that Central by using 8.41% as an index value "low balled" the annual percentage rate, finance charge and other disclosures for the loan. In response, Evans contends that the Note provides for a 45 day

delay in the implementation of changes in the index and, accordingly, 8.41% was appropriate to use as an index value. I agree.

The adjustment formula for the Fidlers loan specifies that the index rate for adjustments is the rate in effect "45 days prior to the Adjustment Date." Pursuant to the Board's regulations for discounted variable rate loans, Central could use *"any index in effect during the 45 day period before consummation* [13] *in calculating a composite interest rate."* 12 C.F.R. Part 226, Supp. I, ¶ 17(c)(1), Comment 10 (emphasis supplied). The Fidlers' loan closed on October 21, 1987 and, accordingly, Evans contends that Central's use of 8.41% as an index value was consistent with TILA.

· The Fidlers assert that Evans' reasoning is flawed because in the September TILA Statement, Central assumed that the loan to the Fidlers would close on November 2, 1987 and, therefore, September 8, 1987 was outside the 45 day look back period provided for in the Note. The Fidlers contention, however, is contrary to the plain language of the Commentary. The Commentary measures the 45 day period from *the actual consummation date not the assumed consummation date for the transaction.* The closing in fact was held on October 21, 1987. Accordingly, I find that Central's use of 8.41% as an index value in the September TILA Statement was consistent with TILA.

Central's use of 9.75% as an initial interest rate for the September TILA Statement, however, was in error. The Fidlers secured an initial interest rate of 9.50% on September 21, 1987 a day before Central generated the September TILA Statement. Pursuant to Regulation Z and the Commentary, the initial interest rate must be reflected in the calculation of the annual percentage rate, finance charge, total payments and payment schedule. Rather than recalculate the disclo-

sures contained in the September TILA Statement using 9.50% as an initial rate and comparing his calculations to the September 1987 disclosures and the tolerances allowed under Regulation Z,[14] Evans admits that he used 9.75% to recalculate the September TILA Statement disclosures. In light of the foregoing, I find that Evans "verification" of the numerical disclosures in the September TILA Statement is, at best, irrelevant to Central's motion for summary judgment.

■ In addition, the Fidlers allege that the $275 they paid to Central as an "application fee" actually constituted a pre-paid finance charge. Consequently, they further allege that Central understated the finance charge for their loan by that amount in the September TILA Statement. Central contends that the $275 was an application fee for purposes of Regulation Z, properly excluded from its calculation and disclosure of the finance charge for their loan to the Fidlers.

Regulation Z excludes from its definition of finance charge "[a]pplication fees charged to all applicants for credit whether or not credit is actually extended." 12 C.F.R. § 226.4(c)(1). *See also* 12 C.F.R. Part 226, Supp I, ¶ 4(c)(1). In support of its motion for summary adjudication regarding the proper characterization of the $275 paid by the Fidlers, Central apparently relies on the Affidavit. This reliance is misplaced. In the Affidavit, Evans does not offer any direct evidence, based on personal knowledge or otherwise, that Central charged a $275 fee to all loan applicants in the fall of 1987. Since the Affidavit merely assumes a material fact in issue, summary judgment must be denied.

■ Finally, the Fidlers complain that Central failed to make appropriate disclosures in the September TILA Statement regarding future adjustments in the interest

**13.** Regulation Z defines "consummation" as "the time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(13).

**14.** For example, Regulation Z has special tolerance rules which limit a borrowers right of rescission in connection with foreclosures on their principal dwelling. 12 C.F.R. § 226.23(h). They provide that for purposes of the exercise of a

right of rescission after the initiation of foreclosure, the finance charge and other disclosures affected by the finance charge such as the amount financed and annual percentage rate will be deemed to be accurate if the disclosed finance charge is understated by no more than $35.00 or is greater than the amount disclosed. *Id. See also* 209 C.M.R. § 32.23(8) (identical tolerance).

rate charged under the Note. In particular, they allege that

> The Fidlers were never told that the Index Value used in these document [*sic* the September TILA Statement ] with [*sic* which is used to calculate] the interest rate to compute finance charge, APR and the total of payments was to fluctuate between the signing of the Truth–In–Lending Statement and consummation.

They further allege that the disclosures regarding rate adjustments are not "plain and conspicuous." [15]

In support of its motion for summary judgment, Central relies on the safe harbor for non-numerical truth-in-lending disclosures established by 15 U.S.C. § 1604(b) which provides, in relevant part:

> The Board shall publish model disclosure forms and clauses for common transactions to facilitate compliance with the disclosure requirements of this title and to aid the borrower or lessee in understanding the transaction by utilizing readily understandable language to simplify the technical nature of the disclosure ... A creditor or lessor shall be deemed to in compliance with the disclosure provisions of this title with respect to other than numerical disclosures if the creditor or lessor (1) uses any appropriate model form or clause as published by the Board, or (2) uses any appropriate model form or clause and changes it by (A) deleting any information which is not required by this title, or (B) rearranging the format, *if in making such deletion or rearranging the format, the creditor or lessor does not affect the substance, clarity, or meaningful sequence of the disclosure.*

(emphasis supplied).

Central contends that it employed the appropriate model clauses applicable to variable rate transactions in the September TILA Statement and, therefore, complied with TILA's and CCCDA's disclosure requirements.[16]

Cursory examination of the September TILA Statement indicates that Central employed the appropriate model clauses for variable rate loans applicable in 1987.[17] *See* 12 C.F.R. Part 226, App. G, H–4 (1987). It also indicates that Central inaccurately characterized the index and interest rate adjustment formula applicable to the loan.

In particular, the September TILA Statement provides, in relevant part:

> Changes in the interest rate are determined by changes in an interest rate index. *The index for this loan is 3.00 above the weekly average of U.S. Treasury Securities adjusted to a constant maturity of one or three years.*

(emphasis supplied).

The applicable index for the loan, as set out in the Note, however, is "the weekly average of the yield on United States Treasury Securities *adjusted to a maturity of 3 years.*" (emphasis supplied). The highlighted statement, then, is inaccurate, in at least, two respects. First, contrary to the September TILA Statement, Central, in determining interest rate adjustments under the Note, does not have the option to elect an index which corresponds to the average weekly yield on

---

**15.** Both TILA and CCCDA require that creditors make truth-in-lending disclosures "clearly and conspicuously." 12 C.F.R. § 226.17; 209 C.M.R. § 32.17. The "clear and conspicuous" standard requires that disclosures be in reasonably understandable form. 12 C.F.R. Part 226, Supp I., ¶ 17(a)(1).

**16.** Pursuant to 15 U.S.C. § 1610(a)(2), the Board has exempted Massachusetts from TILA's non-numerical disclosure requirements for adjustable rate mortgage loans. 48 Fed.Reg. 14882, 14890 (April 6, 1983). Massachusetts, however, has adopted Regulation Z's disclosure standards for adjustable rate loans. *Compare* 209 C.M.R. §§ 32.18(6 ) and 32.19 to 12 C.F.R. §§ 226.18(f) and 226(19) (identical language). *See also* 209 C.M.R. 32.27, (adopting the Board's Official Staff Commentary which does not conflict with Massachusetts law.) In addition, a creditor who employs an appropriate model form or clause promulgated by the Board will be deemed in compliance with CCCDA's non-numerical disclosure requirements. Mass. Gen. Laws ch. 140D, § 18. For clarity, however, the discussion in the body of the text will cite to TILA and Regulation Z rather than CCCDA and the Code of Massachusetts Regulations.

**17.** In December 1987, the Board substantively changed the disclosure requirements and model clauses applicable to variable rate transactions. *See* 52 Fed.Reg. 48665 (December 24, 1987.)

United States Securities adjusted to a constant of one year.[18] In addition, the highlighted statement confuses the index applicable to interest rate adjustments with the formula used to determine interest rate adjustments under the Note. Interest rate adjustments are determined by adding 3.00% to the index. The highlighted statement incorrectly suggests that there is a formula to determine the index applicable to interest rate adjustments under the Note.

Significantly, Evans admits that the highlighted statement is "questionable". He further avers, in relevant part:

> For clarities [sic] sake it could have been changed to read 'The index for this loan is the weekly average of U.S. Treasury Securities adjusted to a constant maturity of one or three years', with the words '3.00 above' deleted. Or it could have been changed to 'The interest rate for this loan is 3.00% above the weekly average of U.S. Treasury Securities adjusted to a constant maturity of one or three years', with the word 'index' changed to 'interest rate' and '%' add to '3.00'. In my opinion, choosing to word the sentence the way in which it was worded was not an attempt to mislead, deceive or otherwise misinform the Fidlers. In fact, I think the Bank was trying to, in good faith, give the Fidlers as much information as possible.... I believe Central Bank was attempting to convey that the interest adjustment would be 3.00% above an index, a fact made clear in later documents such as the Indexed Adjustable Rate Mortgage Note and Indexed Adjustable Rate Mortgage Rider.

 Evans' conclusory assertions regarding Central's subjective good faith are irrelevant to the issue of whether its disclosures complied with TILA. *See, e.g., Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 896, 898 (3rd Cir.1990) (a lender "who fails to comply with TILA in any respect is liable to consumer regardless of the nature of the violation *or the creditors intent.*") (emphasis supplied). Similarly, Evans contention that the disclosures contained in the September

TILA Statement were corrected by disclosures in the Note and the Mortgage is also without merit. Regulation Z requires that truth-in-lending disclosures "reflect the terms of the legal obligations between the parties" and be reasonably understandable. 12 C.F.R. §§ 226.17(a) and 226.17(c). The highlighted statement does not comply with either norm. In light of the foregoing, the Fidlers are entitled to summary judgment on the issue of whether Central's non-numerical disclosures in the September TILA Statement violated TILA.

### d. Count 2—The October TILA Calculations & The Commitment Letter

Count 2 relates to the Commitment Letter and certain truth-in-lending calculations Central performed in October 1987. In particular, the Fidlers allege that the index applicable to their loan increased between September 22, 1987, the date of the September TILA Statement and October 7, 1987. In addition, they allege that on October 7, 1987, Central recalculated the annual percentage rate, finance charge and other truth-in-lending disclosures applicable to their loan. The Fidlers contend that although the results of Central's October calculations, themselves, understated the annual percentage rate and finance charge for their loan, the results indicated that the September TILA Statement had understated the annual percentage rate and finance charge for their loan. They further allege, in relevant part:

> [They] were never told that their finance charge could increase with the movement of the Index Value before consummation. The Fidlers assumed when they paid their $400.00 to lock their interest rate of 9.5% on September 21, 1987, the finance charge was also locked in ... Central, not disclosing the increase in the movement of the Index Value to the Fidlers, between September 23 to October 9, 1987, was committing an act of fraud, as they knew or should have known, the Fidlers did not know the increase in the Index Value in-

---

**18.** The variance between the one year and the three year Treasury Index for the week of September 8, 1987 was 1.00%.

**428**

creased the finance charge, APR, and total payments used between the periods.

In support of its motion for summary judgement, Central relies on the Affidavit. Evans admits that the October truth-in-lending calculations are premised on a different index value than the disclosures contained in the September TILA Statement.[19] He explains, however, that the change in the assumption regarding the index value for the loan in the October truth-in-lending calculations did not result in an increase in the actual cost of borrowing to the Fidlers.

As discussed previously in connection with Count 1, Central's use of 8.41% as an index value to calculate the disclosures in the September TILA Statement is consistent with the Board's rules for discounted variable rate loans. In addition, Evans correctly points out that the index value employed in the September TILA Statement and the October calculations are imperfect approximations of the actual indexes in effect when the interest rate for the loan is adjusted. Changes in the index prior to consummation did not alter the Fidlers actual cost of borrowing. Notwithstanding the foregoing, as discussed previously in connection with Count 1, Central's disclosures regarding interest rate adjustments did not comply with TILA.

■ The Fidlers also allege in Count 2 that the Commitment Letter understated the annual percentage rate applicable to their loan by .09%. They do not object to Central's use of 8.71% as an index value to calculate the annual percentage rate. Instead, they contend the annual percentage rate reflects a mistaken assumption about the amount financed in the transaction.

Evans admits that the annual percentage rate contained in the Commitment Letter reflects a mistaken assumption regarding the amount financed. In addition, he avers that assuming an initial interest rate of 9.5% and an index value of 8.71% and correcting the assumption regarding the amount financed, the Commitment letter should have disclosed an annual percentage rate of 11.09%. He

contends, however, that the mistaken disclosure in the Commitment Letter "did not trigger a need to re-disclose."

Evans is correct. Pursuant to 12 C.F.R. § 226(a)(2), an annual percentage rate is considered accurate "if it varies in either direction by not more than 1/8 of 1 percentage point from the actual annual percentage rate." 12 C.F.R. Part 226, Supp I, ¶ 226(a)(2). The annual percentage rate disclosed in the Commitment Letter when compared either to the Fidlers' or Central's calculation of the actual annual percentage rate is within this tolerance. In light of the foregoing, Central is entitled to summary judgment on the issue of whether its disclosure of the annual percentage rate in the Commitment Letter violated TILA.

e. *Count 3–The October TILA Statement*

■ In Count 3, the Fidlers allege that at the loan closing Central "unbeknownst to the Fidlers, changed the Index Value ... to 9.10% increasing the finance charge, APR and total payments" for the loan. The Fidlers further allege as they did in Count 2 that Central knew based on the calculations it performed on October 7, 1997 that it had understated the annual percentage rate and finance charge for the loan and failed to amend their disclosures prior to the loan closing. In addition, they contend that although they signed the October TILA Statement at the closing they never received a copy of the Statement.

In support of its motion for summary judgment, Central contends that it did not change the Fidlers cost of borrowing by recalculating its truth-in-lending disclosures using an index value of 9.10%. Central further contends that it did not understate the annual percentage rate and finance charge for the loan in its previous disclosures. Finally, Central asserts that it did provide the Fidlers with a copy of the October TILA Statement.

It is difficult to determine from the Fidlers' Complaint and opposition to summary judgment whether they contend that the October TILA Statement evidences that Cen-

**19.** The parties agree that the October calculations are premised on an index value of 8.71% which corresponds to the 3 Year Treasury Index for the week of September 28, 1987 published in the Board's Selected Interest Rates Publication, H–15.

tral changed the actual finance charge for their loan at closing or that it understated the finance charge and annual percentage rate in its previous disclosures. Both contentions are without merit. As discussed previously, in a variable rate transaction, where the applicable interest depends on future indexes, the actual finance charge and annual percentage rate for the loan can only be determined after the loan matures. Central did not change the terms of the loan or the Fidlers' cost of borrowing but merely its estimate of future indexes by using 9.10% as an index value in calculating the truth-in-lending disclosures contained in the October TILA Statement. The Fidlers' contention that the October TILA Statement evidences that Central's previous disclosures are understated is also without merit. 9.10% was the 3–Year Treasury Index for the week of October 9, 1987. As discussed previously, in connection with Count 1, however, Central's use of 8.41% as an index value to calculate the disclosures in the September TILA Statement was consistent with the Board's rules for discounted variable rate loans. Under the Board's rules, Central could use any index in effect during the 45 day period prior to the loan closing to calculate its truth-in-lending disclosures. Changes in the index value during this period did not render Central's original disclosures inaccurate or oblige Central to make new disclosures under TILA or CCCDA.

 Pursuant to Regulation Z, Central was required to make its truth-in-lending disclosures "in writing, in a form that consumers may keep." 15 U.S.C. § 226.17(a). In support of its motion for summary judgment, Central relies on the acknowledgment of receipt on the October TILA Statement signed by the Fidlers. The signed acknowledgment constitutes prima facie evidence of delivery and pursuant to Rule 56 shifts the burden to the Fidlers to offer some evidence in support of their allegation that Central did not provide them with a copy of the October TILA Statement. *See Whitlock v. Midwest Acceptance Corp.*, 575 F.2d 652, 653 (8th

Cir.1978). The Fidlers admit that they signed the October TILA Statement and they have not supported their allegation that Central failed to provide them with a copy of the Statement by affidavit or otherwise.[20] In light of the foregoing, Central is entitled to summary judgment on Count 3.

### f. Counts 4 & 5—The 1990 and 1993 Adjustment Notices

Counts 4 and 5 relate to the 1990 and 1993 Adjustment Notices. The Fidlers allege that Central did not timely furnish them with the 1990 Adjustment Notice and that the 1990 and 1993 Adjustment Letters violated Massachusetts law because they did not include the "actual mathematical calculations" for the interest rate adjustment disclosures. In support of this contention, they rely on Administrative Bulletin No. 13–2C (Revised 1988) (the "Administrative Bulletin"), issued by the Division of Banks and Loan Agencies for the Commonwealth of Massachusetts.

In support of its motion for summary judgment, Central submits the Affidavit of Thomas Sherry, Keeper of Records for Central ("Sherry"). Central contends that Sherry's Affidavit establishes that it timely furnished the 1990 Adjustment Notice. In addition, Central relies on the Affidavit. Evans avers that he is unfamiliar with the Administrative Bulletin and CCCDA; however, notwithstanding the foregoing, he contends that the provisions of the Administrative Bulletin which require that adjustment notices contain the "actual mathematical calculations" for interest rate adjustment disclosures should be construed as requiring lenders to disclose the results of adjustment calculations not the formulas or algorithms which determine the results. As set forth below, whether the Fidlers received the 1990 Adjustment Notice constitutes a triable issue. Central is, however, entitled to summary judgment on the issue of whether the Adjustment Notices complied with the Administrative Bulletin.

---

20. Significantly, in his affidavit in opposition to Central's motion, John Fidler does not aver that he did not receive a copy of the October TILA Statement. Instead, he avers that in 1995 he advised counsel for Central that he did not receive a copy of the October TILA Statement. This is insufficient to defeat summery judgment.

■ Generally speaking, both Regulation Z and the regulations implementing CCCDA require that lenders make certain disclosures in connection with interest rate adjustments in variable rate transactions. 12 C.F.R. § 226.20(c), 209 C.M.R. 32.20, (c). When an interest rate adjustment changes payments under the loan, the disclosures "must be placed delivered or placed in the mail" at least 25 but not more than 120 days before a payment at a new level is due. Id Sherry avers that Central's records indicate that it mailed the 1990 Adjustment Letter to the Fidlers on October 27, 1990. Sherry further avers that the Fidlers adjusted their payments to Central in accordance with the 1990 Adjustment Letter. In opposition, the Fidlers claim that they did not receive the 1990 Adjustment Notice and they support their claim with an affidavit from John W. Fidler. In light of this factual dispute, Central's request for summary judgment on the issue of whether it timely furnished the 1990 Adjustment Notice to the Fidlers is denied.

■ The Administrative Bulletin provides, in relevant part that:

A written notice which complies with the provisions of 209 C.M.R. 32.20, (C) shall be mailed to the borrower ... prior to the scheduled adjustment and *shall include all of the details of the adjustment calculation required in Section (3.03) [of the Administrative Bulletin] including the actual mathematical calculations.*

Administrative Bulletin Ref No. 13–2C § 3.04 (Revised 1988) (emphasis supplied). Section 3.03 of the Administrative Bulletin requires the following "mathematical calculation" be disclosed: New Index Value + Margin = New Base Rate. The Fidlers do not contend that Central's Adjustment Notices did not comply with 209 C.M.R. § 32.20(c). Further, a cursory examination of the Adjustment Notices indicates that Central included the simple, arithmetic calculation prescribed by the Administrative Bulletin. In light of the foregoing, Central is granted summary judgment on the issue of whether the contents of the Adjustment Notices complied with the Administrative Bulletin.

## C. The *Fidlers' Claims Under Mass. Gen. Laws ch. 93A*

The Fidlers' claims under Mass. Gen. Laws ch. 93A ("93A claims") are principally premised on the allegations which purport to support their claims under TILA and CCCDA. In support of its motion for summary judgment, Central argues that: 1) the Fidlers' 93A claims are time barred under the four year statute of limitations applicable to consumer protection actions; and 2) it has demonstrated that it complied with TILA and CCCDA.

■ Violations of TILA and CCCDA constitute "unfair and deceptive acts or practices" for purposes of Mass. Gen. Laws ch. 93A. Mass. Gen. Laws ch. 140D, § 32; 940 C.M.R. §§ 3.16(3) and 3.16(4). The Fidlers' truth-in-lending claims have been previously discussed. Accordingly, the following discussion will be limited to the issue of whether the Fidlers' 93A claims are time barred.

■ The relevant period of limitations for the Fidlers' 93A claims is four years. Mass. Gen. Laws ch. 260, § 5A. Generally speaking, 93A claims accrue at the time the injury from the assertedly unfair or deceptive acts occur. *Cambridge Plating Co., Inc. v. Napco, Inc.,* 991 F.2d 21, 25 (1st Cir.1993). In addition, 93A claims are subject to the "discovery rule" which provides that "regardless of the actual time of breach or injury, 'a cause of action does not accrue until a plaintiff discovers or reasonably should have discovered, that she may have been injured as a result of the defendants conduct.'" *Id.* (quoting *Hoult v. Hoult,* 792 F.Supp. 143, 144 (D.Mass.1992)).

■ The Fidlers commenced the present action on June 4, 1996 and their surviving truth-in-lending claims relate to Central's conduct in 1987 and in 1990. Whether the Fidlers' 93A claims are time barred depends on whether they can demonstrate that they could not have reasonably discovered Central's alleged truth-in-lending violations prior to June 1992. *Id.* at 29. In opposition to Central's contention that their 93A claims are time barred, the Fidlers argue that they did not receive copies of the October TILA Statement or the 1990 Adjustment Notice

until October 1995. The Fidlers argument is without merit. I find that the variance between the disclosures in the September and October TILA Statements gave the Fidlers, at least, inquiry notice that Central could have substantially understated the finance charge for their loan. Similarly, the Fidlers made payments to Central between 1990 and 1993, presumably in reliance on billing statements from Central, which reflected the interest rate described in the 1990 Adjustment Letter. I find that these payments evidence that the Fidlers were on inquiry notice that Central should have furnished them with additional truth-in-lending disclosures regarding the change in the interest rate applicable to their loan.

■ Notwithstanding the foregoing, however, I hold that the Fidlers may assert their 93A claims defensively as claims in recoupment against Central's claims arising under the Note and Mortgage.

## C. The Fidlers' Common Law Claims

The Fidlers also assert common law claims for intentional misrepresentation, negligence and "unconscionability." Each common law count is addressed separately below.

### 1. Intentional Misrepresentation

■ The Fidlers's misrepresentation claim relates to their attempts to negotiate a forbearance agreement with Central in 1995. In particular, the Fidlers allege that in September 1995, John Fidler advised Berberian that he was expecting a sum of money for services performed for the Commonwealth of Massachusetts which could be applied to the arrearage under the loan and requested that Central put the arrearage "on the end of the mortgage." [21] The Fidlers further allege that Berberian told John Fidler that he would provide the Fidlers with an application for a forbearance agreement when he knew that Central was about to imminently foreclose on the Property. Central contends that the Fidlers misrepresentation claim must fail because the Fidlers have failed to demonstrate that they detrimentally relied on Berberian's representations or that Berberi-

an made representations to induce them to act.

"To sustain a claim of misrepresentation a plaintiff must show a false statement of material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment." *Zimmerman v. Kent,* 31 Mass.App.Ct. 72, 575 N.E.2d 70 (1991). *See also Powell v. Rasmussen,* 355 Mass. 117, 118–119, 243 N.E.2d 167 (1969); *Danca v. Taunton Sav. Bank,* 385 Mass. 1, 8, 429 N.E.2d 1129 (1982). The actionable statement must be one of fact, not expectation, estimate opinion or judgment. *Powell,* 355 Mass. at 118–119, 243 N.E.2d 167. The Fidlers admit that Berberian advised them that it would be "up to the [sic] Central's Board to approve" the forbearance agreement. Further, the Fidlers do not allege they undertook any action in reliance on Berberian's representation that he would send them an application. In light of the foregoing, Central is entitled to summary judgment on the Fidlers' claim for misrepresentation. *Cf. Hogan v. Riemer,* 35 Mass.App.Ct. 360, 367, 619 N.E.2d 984(1993).

### 2. Negligence

■ The Fidlers also allege that Central negligently misrepresented the "nature and terms" of the 1987 loan. In support of its motion for summary judgment, Central cites *Federal Deposit Insurance Corporation v. Fordham (In re Fordham),* 130 B.R. 632 (Bankr.D.Mass.1991), for the proposition that "[t]here is no liability for negligence in a lender making a loan to a borrower because the lender owes no duty to a borrower of reasonable care."

Central inappropriately expands *Fordham's* holding. In *Fordham,* Judge Queenan did not address the issue of a lenders' duty of care in making representations to potential borrowers regarding the circumstances under which the interest rate for the loan may change or whether violations of TILA and CCCDA will support a claim for negligent misrepresentation. *Fordham* addresses the narrow issue of whether a lender owes its borrower or guarantor a duty of care to determine that the project financed by the

---

**21.** Presumably, the Fidlers were asking Central to capitalize the loan arrearage.

loan is sufficiently feasible to permit repayment of the loan. *Id.* at 646.

■ Under Massachusetts law, negligent as well as intentional misrepresentations are actionable if they are intended to induce action and are detrimentally relied on. *Barden v. HarperCollins Publishers, Inc.,* 863 F.Supp. 41, 43 (D.Mass.1994). In light of the foregoing, I find that the Fidlers' have properly set forth a claim for negligent misrepresentation and Central's motion for summary judgment is denied.

### 3. *Unconscionability*

■ Lastly, the Fidlers allege that the loan agreement with Central is unconscionable. In particular, they allege, *inter alia,* that "there was a gross disparity between the cost of the loan to the Fidlers and the benefit given." In support of its motion for summary judgment, Central merely asserts that the Fidlers have failed to state a claim. I disagree.

■ Under Massachusetts law a contract may be unconscionable if its terms are substantively unfair or oppressive. *Piantes v. Pepperidge Farm, Inc.,* 875 F.Supp. 929, 935–936 (D.Mass.1995). The Supreme Judicial Court has explicitly cited "gross disparity of consideration" as an example of substantive unconscionability. *Waters v. Min Ltd.,* 412 Mass. 64, 68, 587 N.E.2d 231 (1992). In light of the foregoing, Central's motion for summary judgment is denied.

### V. *Conclusion*

As set forth above, Central's motion for summary judgment is denied in part and allowed in part. The Fidlers' motion to strike Evans' Affidavit is denied. A separate order will issue and a pre-trial conference will be scheduled in the ordinary course.