# United States Court of Appeals
## For the First Circuit

No. 11-1188

IN RE: ANGELO DIVITTORIO,

Debtor.

ANGELO DIVITTORIO,

Appellant,

v.

HSBC BANK USA, NA as Trustee on behalf of ACE Securities Corp.
Home Equity Loan Trust and for registered holders of ACE
Securities Corp. Home Equity Loan Trust, Series 2006-SD1,
Asset-Backed-Pass Through Certificates,

Appellee,

OCWEN LOAN SERVICING, LLC; INDYMAC FEDERAL BANK,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Edward F. Harrington, U.S. District Judge]

Before

Lipez, Ripple,* and Howard,
Circuit Judges.

Harvey S. Shapiro was on brief for appellant.
David E. Fialkow, with whom Jeffrey S. Patterson and Nelson,
Mullin, Riley & Scarborough LLP were on brief, for appellee.

---

* Of the Seventh Circuit, sitting by designation.

January 6, 2012

**RIPPLE, <u>Circuit Judge</u>**.  Angelo DiVittorio filed this adversary proceeding in which he asserted a right to rescind a loan agreement on the ground that the disclosures made at closing did not comply with the Massachusetts Consumer Credit Cost Disclosure Act ("MCCCDA"), Mass. Gen. Laws ch. 140D, § 10, the Commonwealth's equivalent of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 <u>et</u> <u>seq</u>.  The bankruptcy court held that Mr. DiVittorio had failed to state a claim for relief and, alternatively, had waived his right to rescind the transaction.  The district court affirmed the bankruptcy court's judgment for failure to state a claim, but did not reach the issue of waiver.  We conclude that Mr. DiVittorio's complaint in the adversary proceeding failed to state a claim and, alternatively, that Mr. DiVittorio knowingly and voluntarily waived any rights to rescission.  We therefore affirm the judgment of the district court.

I

## A.  Loan Origination

Mr. DiVittorio and his brother, Joseph DiVittorio ("Joseph"), have resided at 39-41 Bonner Avenue, in Medford, Massachusetts, since 1970.  On March 13, 2003, Mr. DiVittorio entered into a loan agreement in the amount of $330,000 by executing a note and granting a first mortgage to IndyMac Bank, FSB ("IndyMac").  Joseph also signed the mortgage, but is not an obligor on the note.

At the closing on March 13, 2003, Mr. DiVittorio received multiple disclosures regarding the note and mortgage, including: (1) the "Truth in Lending Disclosure Statement" (the "TIL Disclosure"), App. 37; (2) a three-page document titled "Adjustable Rate Mortgage Loan Program Disclosure Non-Convertible 2/6 LIBOR Performance ARM" (the "ARM Disclosure"), id. at 38-40; (3) an "Addendum to Fixed/Adjustable Rate Note" (the "Addendum"), id. at 60; and (4) the "Rider to Security Instrument and Fixed/Adjustable Rate Rider" (the "Adjustable Rate Rider"), id. at 78.

The TIL Disclosure recited an annual percentage rate ("APR") of 7.365%, noted that the loan contained a "variable rate feature" and referred the borrower to a separate disclosure regarding the variable rate. Id. at 37. The ARM Disclosure revealed that the loan was subject to a performance-based rate reduction according to which Mr. DiVittorio would qualify for a reduced margin if he made the first two years of payments in a timely manner. Specifically, the ARM Disclosure explained that the interest rate on the note would be determined as follows:

> Your Interest Rate will be based on an index rate plus a margin, rounded to the nearest .125% (the "Interest Rate"), unless your Caps limit the amount of change in the Interest Rate. The "Margin" is the amount which will be added to the index to determine your Interest Rate. The Margin may be reduced by .50%, for credit levels I+, I, and II as shown in the examples below; and, by 1.00% for credit levels III and IV after the second year of the loan if all payments for the first two years of the loan are paid on time. If the

-4-

> Margin is reduced after the second year of the loan, the Margin will not change throughout the remaining term of the loan. Please ask us for our current Interest Rates and Margins.

Id. at 38. The ARM Disclosure did not indicate Mr. DiVittorio's "credit level" or the potential margin reduction he would receive pursuant to the reduction feature; however, both the Addendum and the Adjustable Rate Rider clarified that he was entitled to a .500% margin reduction if he timely made the first twenty-two payments. Although, for purposes of calculating the APR, IndyMac employed the reduced rate for which Mr. DiVittorio would become eligible after two years of timely payments, the TIL Disclosure itself did not state that the APR accounted for this performance-based reduction in interest rate.

## B.  Bankruptcy Proceedings

Mr. DiVittorio filed his Chapter 13 petition on October 11, 2005. Ocwen Loan Servicing, LLC ("Ocwen"), the entity which serviced Mr. DiVittorio's mortgage, first moved for relief from the automatic stay in order to foreclose on the property on August 10, 2006; Mr. DiVittorio opposed the motion. After two months of negotiations, the parties filed a stipulation on October 25, 2006, according to which Mr. DiVittorio agreed to cure the post-petition arrearage.

On March 22, 2007, Ocwen filed an affidavit of non-compliance, asserting that Mr. DiVittorio again had defaulted. After months of negotiations, Mr. DiVittorio filed an "Assented

Motion of Debtor for Authority to Modify Loan with Ocwen Loan Servicing, LLC" on November 30, 2007. Id. at 99. In his motion, Mr. DiVittorio represented to the bankruptcy court that he and Ocwen had "engaged in extensive negotiations regarding the subject original loan documentation including the original note and mortgage." Id. Mr. DiVittorio further stated that he "believe[d] that this Modification Agreement [wa]s beneficial for the Debtor and all creditors in this case and [wa]s in the best interest of this estate." Id. at 100.

The modification agreement attached to the motion (the "Modification") reduced the interest rate on the loan from in excess of eleven percent to a fixed rate of seven percent and amortized the arrearage over the remaining life of the loan. The Modification also contained the following release (the "Release") by Mr. DiVittorio:

> YOUR RELEASE OF OCWEN:[1] IN THE EVENT THAT YOU HAVE ANY CLAIMS, ACTIONS OR CAUSES OF ACTION, STATUTE OF LIMITATIONS OR OTHER DEFENSES, COUNTERCLAIMS OR SETOFFS OF ANY KIND WHICH EXIST AS OF THE DATE OF THIS MODIFICATION, WHETHER KNOWN OR UNKNOWN TO YOU, WHICH YOU NOW OR HEREAFTER MAY ASSERT AGAINST OCWEN IN CONNECTION WITH THE MAKING, CLOSING, ADMINISTRATION, COLLECTION OR THE ENFORCEMENT BY OCWEN OF THE LOAN DOCUMENTS, THIS MODIFICATION OR ANY OTHER RELATED AGREEMENTS, THEN BY EXECUTING THIS MODIFICATION YOU FOREVER IRREVOCABLY WAIVE AND RELINQUISH THEM.

---

[1] The Modification expressly defined Ocwen to include HSBC Bank, USA, N.A. ("HSBC"), the assignee-holder of the mortgage. App. 103.

-6-

> FOR PURPOSES OF THIS SECTION, OCWEN SHALL SPECIFICALLY, [sic] INCLUDE BUT SHALL NOT BE LIMITED TO, PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, SERVICING AGENTS, ATTORNEYS AND ALL PRIOR AND SUBSEQUENT PARTIES OR PREDECESSOR(S) IN INTEREST, TO BOTH OCWEN AND INVESTOR.

Id. at 106. In the Modification itself, Mr. DiVittorio warranted that he "ha[d] obtained, or ha[d] had the opportunity to obtain, independent legal counsel concerning the meaning and importance of this Modification," id.; indeed, Mr. DiVittorio's former counsel signed the Modification. The Modification also contained a statement that Mr. DiVittorio had entered the Modification "voluntarily and with full understanding of its contents and meaning." Id. The bankruptcy court approved the Modification on December 11, 2007.

Mr. DiVittorio again fell behind on his mortgage payments, and Ocwen moved for relief from the stay. After several extensions, Mr. DiVittorio filed an opposition on February 3, 2009. On February 5, 2009, the bankruptcy court granted Ocwen's motion for relief effective March 27, 2009.

## C. Adversary Proceeding

Shortly thereafter, by a letter dated February 11, 2009, and addressed to HSBC, Ocwen and IndyMac, Mr. DiVittorio purported to rescind the loan and requested an accounting. Two days later, Mr. DiVittorio, through new counsel, filed a motion seeking to vacate the order granting relief from stay on the basis that he had

rescinded the loan.  Ocwen filed an opposition, and, on March 10, 2009, Mr. DiVittorio filed the present adversary proceeding asserting his claim of rescission under the MCCCDA.[2]

**1.**

In his complaint, Mr. DiVittorio alleged that IndyMac violated the MCCCDA because the APR set forth on the TIL Disclosure was not calculated in conformity with applicable regulations. Mr. DiVittorio also alleged that the TIL Disclosure significantly underestimated the finance charge for the loan and also failed to specify the timing of the installment payments.  The failure to make these material disclosures, Mr. DiVittorio averred, entitled him to rescission, damages and attorneys' fees.

On March 12, 2009, the bankruptcy court held a hearing on Mr. DiVittorio's motion.  The judge declined to vacate his order but stayed the foreclosure for ninety days to determine the validity of Mr. DiVittorio's purported rescission.

HSBC later moved to dismiss the complaint on the ground that it was time-barred and that Mr. DiVittorio had not stated a claim for relief under the TILA or the MCCCDA.  Mr. DiVittorio filed an opposition asserting that the APR stated on the TIL

---

[2]  Mr. DiVittorio named the following defendants in the complaint:  HSBC; IndyMac Federal Bank, as successor to IndyMac; and Ocwen.  The Federal Deposit Insurance Corporation, as receiver for IndyMac, successfully moved to be substituted for IndyMac Federal Bank and to be dismissed from the action.  Similarly, the district court granted Ocwen's motion to dismiss.  Mr. DiVittorio does not contest these rulings.

Disclosure was numerically inaccurate because it took into account the performance-based rate reduction. Alternatively, he argued that this method of calculation was not clearly and conspicuously disclosed. He further maintained that the APR must be calculated using conditions as they existed at the time the loan was consummated. In his view, because the performance-based rate reduction was not in effect at the time of consummation, IndyMac should not have used that rate reduction in calculating the APR. Finally, Mr. DiVittorio claimed that, based on the statistical data within IndyMac's possession, IndyMac was not justified in assuming that his first twenty-two payments would be timely.

**2.**

In its initial memorandum of decision, the bankruptcy court granted the motion to dismiss. It first determined that Mr. DiVittorio's rescission claim was not time-barred:

> The primary difference between TILA and the CCCDA is the time within which actions for either damages or rescission must be commenced. Under TILA, actions for damages must be brought within one year of the occurrence of the violation, while actions for rescission must be brought within three years. In contrast, actions under the CCCDA generally must be brought within four years. In In re Fidler, however, I held that an action under the CCCDA, including one seeking rescission, may be asserted defensively by way of recoupment outside the four year statutory period. "To demonstrate that a claim is being asserted in recoupment, the following elements must be satisfied: '(1) the [CCCDA] violation and the creditor's debt arose from the same transaction, (2) [the claimant] is asserting

-9-

> her claim as a defense, and (3) the 'main action' is timely.'"
>
> In the present case, I find that all elements of recoupment are met. Clearly, both the Defendant's secured claim and the Debtor's CCCDA claim arise from the March 13, 2003 loan transaction. Moreover, the Debtor is asserting his CCCDA claims defensively in response to the Defendant's impending foreclosure of the Property. While the Defendant disputes that this adversary proceeding is defensive in nature because the Debtor did not plead recoupment, it correctly acknowledges this argument places form over substance. Although mention of recoupment is conspicuously absent from the Complaint, it was not filed in a vacuum and the Defendant's collection attempts cannot be ignored. Finally, the "main action" in this litigation, namely, Ocwen's proof of claim and motion for relief from stay, is timely. Therefore, I find that the Debtor's CCCDA claims are timely.

In re DiVittorio ("DiVittorio I"), No. 05-20854, 2009 WL 2246138, at *9 (Bankr. D. Mass. July 23, 2009) (alteration in original) (footnotes omitted).

On the merits, however, the bankruptcy court found that the TIL Disclosure conformed with the requirements of the statute and regulations. Specifically, IndyMac's calculation of the APR was proper and, therefore, not misleading. Additionally, IndyMac's omission of the word "monthly" from the payment schedule would not have caused the average consumer to be confused with respect to his payment obligations and, therefore, was not a basis for rescinding the transaction.

Mr. DiVittorio appealed to the district court, which remanded on grounds that do not bear directly on the matters presently before us. When the case returned to the bankruptcy court, Mr. DiVittorio suggested that, in lieu of further briefing on the motion to dismiss, the parties simply submit the briefs that they had filed in the district court. HSBC also requested an opportunity to file a motion for summary judgment focused on its claim that, even if Mr. DiVittorio had stated a claim for relief under the TILA and the MCCCDA, he nevertheless had waived any rights under those statutes. The bankruptcy court granted both requests.

HSBC subsequently filed its motion for summary judgment in which it argued that Mr. DiVittorio had released all his claims against HSBC, including any claim to rescission, when he entered into the Modification.[3] In his opposition, Mr. DiVittorio asserted that the waiver should not be enforced on statutory and policy grounds and that his brother Joseph, as co-owner of the property, had exercised his own right to rescind the transaction, which the court was required to recognize.

The bankruptcy court affirmed its initial decision with respect to the motion to dismiss. The bankruptcy court observed

---

[3] HSBC also argued that Mr. DiVittorio was judicially estopped from seeking rescission. The bankruptcy court rejected this argument, and HSBC does not press it in this court.

-11-

that the commentary to the TILA is "silent as to the question posed here: namely, whether a lender, at the time of consummation, can factor an assumption of timely payments into the APR calculation?" In re DiVittorio ("DiVittorio II"), 430 B.R. 26, 43 (Bankr. D. Mass. 2010). The bankruptcy court continued:

> The parties each rely on different considerations to fill in the gap left by the Commentary. Generally, the CCCDA requires disclosures to "reflect the terms of the legal obligation between the parties" and, in the absence of exact information, be "based on the best information reasonably available at the time the disclosure is provided." The Defendant asserts that the terms of the Note and Mortgage required timely payments, while the Debtor argues that an assumption of timely payments was contrary to the best information available.

Id. (footnote omitted) (quoting 209 Mass. Code Regs. § 32.17(3)(a),(b)). The bankruptcy court observed that, in its prior decision, it had "accepted the Defendant's argument, finding that an assumption of timely payments is reasonable because '[t]hat is no more than what the borrower agrees to do when he signs the note and mortgage.'" Id. (quoting DiVittorio I, 2009 WL 2246138, at *10). Moreover, the bankruptcy court did not believe that Mr. DiVittorio's "statistical data showing that sub-prime borrowers were likely to be delinquent in their mortgage payments" should alter its conclusion:

> First and foremost, all disclosures are premised on what the parties obligate themselves to do. This is what the regulation requires and the reason is obvious-- to assume

-12-

otherwise would render every disclosure an estimate and preclude any meaningful disclosure. For this reason, I question whether a borrower's strict compliance with the terms of his legal obligation can ever be deemed "unknown" for the purposes of this regulation. Therefore, because the lender had the exact information, resort to the "best information reasonably available," whatever that may have been, was unnecessary.

Id. at 44 (footnotes omitted). The bankruptcy court then turned to the remaining of Mr. DiVittorio's contentions:

> While the Debtor attempts to distance himself from this obligation by acknowledging only its "technical" accuracy and emphasizing the contingent nature of the Defendant's obligation to adjust the interest rate based upon the Reduction Feature, these characterizations miss the mark. The Debtor was obligated to make timely payments and, upon making twenty-two timely payments, the Defendant was obligated to adjust the interest rate based upon a reduced margin to determine the interest rate for the remaining term of the loan. Indeed, if at the time of consummation one assumes the borrower will strictly comply with his obligations, which I find the regulation requires, then logically the lender must similarly factor in any obligation based on that strict compliance.

Id. The bankruptcy court believed that Mr. DiVittorio's "attack on the design of the product" was an "attempt to revive a time-barred predatory lending claim." Id. The bankruptcy court observed that

> the central premise of the Debtor's Complaint, that the assumption of timely payments was not justified, sounds in negligence and speaks to the lender's business practices. Although dressed up in terms of numerical inaccuracy, the Debtor's argument is that the Defendant, by use of a complex adjustable interest rate

-13-

> feature premised on the Debtor's obligation to make timely payments, was able to disclose a better APR than he would likely receive. That simply is not a CCCDA claim because the disclosure was based upon what the regulations required.

Id. at 45. The bankruptcy court concluded that, "[a]s neither TILA nor the CCCDA substantively regulate credit terms, I cannot say the present calculation violates either statute absent a clearer directive from either Congress or the Federal Reserve Board," and "it is not the Court's role to read new requirements and prohibitions into the statute." Id. Consequently, the bankruptcy court again dismissed Mr. DiVittorio's adversary complaint for failure to state a claim.

In the interests of judicial economy, the bankruptcy court also considered the issue of waiver raised by way of HSBC's motion for summary judgment. The bankruptcy court first determined that, contrary to Mr. DiVittorio's assertions, it did not have to consider the effect of Joseph's attempted rescission because he was not a plaintiff in the adversary proceeding or in any other action. Addressing the substance of the motion, the bankruptcy court turned to whether Mr. DiVittorio had waived his right to rescission by entering the modification. The bankruptcy court observed that neither the regulation nor the commentary "entirely address[ed] the issue implicitly raised by the Debtor, namely, whether it is possible to waive the right of rescission after the expiration of the initial rescission period but before the underlying claim is

-14-

raised." Id. at 49. After reviewing the case law from other bankruptcy courts and circuits, the court concluded:

> I find that as a matter of Massachusetts law, the Debtor's possession of the loan documents put him on inquiry notice of his purported CCCDA claims and his right to rescind. Moreover, by specifically referencing claims arising "in connection with the making, closing, administration, collection, or the enforcement . . . of the loan documents," the Release should have compelled him to investigate the possibility of such claims. It is also significant that the Debtor executed this Release as part of the Modification after eight months of negotiations with the Defendant, during which he was represented by counsel. As a necessary part of that representation, prior counsel would have reviewed the loan documents, analyzed any possible claims arising therefrom, negotiated the terms of the Modification, explained them to the Debtor, and made a recommendation with respect to a course of action. Consequently, I find the Debtor's execution of the Release contained within the Modification was knowing and voluntary.

Id. at 54 (alteration in original) (footnotes omitted).

The district court affirmed the bankruptcy court's dismissal of Mr. DiVittorio's complaint and adopted the reasoning of the bankruptcy court with respect to that issue. It did not reach, however, HSBC's motion for summary judgment and, therefore, did not consider the validity of the waiver.

**II**

## A. Statutory Framework

Mr. DiVittorio's claim is brought under Massachusetts's

-15-

analog to the TILA, the MCCCDA.[4]  As we have observed in a previous

case:

> The law to be applied in this case involves an unusual interplay of federal and state law.  The overall statutory framework is provided by the federal Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq.  Pursuant to § 1633 of that title, however, the Federal Reserve Board has determined that [the MCCCDA] establishes requirements "substantially similar" to TILA's and thus serves to exempt transactions within Massachusetts from the federal disclosure requirements.

Bizier v. Globe Fin. Servs., Inc., 654 F.2d 1, 2 (1st Cir. 1981).[5]

---

[4]  We do not believe that the Supreme Court's recent decision in Stern v. Marshall, 131 S. Ct. 2594 (2011), affects the jurisdiction of the bankruptcy court to render a decision in this matter.  Stern held:

> Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article.  We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984.  The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.

131 S. Ct. at 2620.  Here, however, it first was necessary to resolve the validity of Mr. DiVittorio's claim under the MCCCDA to determine whether HSBC was entitled to relief from the automatic stay.

[5]  For this reason, although Mr. DiVittorio's adversary complaint sets forth a single cause of action citing both the TILA and the MCCCDA, it is clear that the MCCCDA is the operative statute.  See App. 35 ("Based upon the foregoing, the Plaintiff is entitled to a declaration confirming his right to a rescission of the IndyMac loan . . . under G.L. c. 140D, § 10.").  It is for this reason that the parties in their briefing and their argument focus on the MCCCDA.  See Appellant's Br. 17 ("Because the Federal
(continued...)

-16-

Specifically, the Federal Reserve Board (the "FRB" or the "Board")
has exempted credit transactions within Massachusetts from chapters
two and four of the TILA; contained in those chapters is the
statute of limitations for actions for damages and rescission.
Therefore, Mr. DiVittorio's claim technically is brought under the
MCCCDA. Nevertheless, the MCCCDA was "closely modeled" after the
TILA and, in most respects, "mirrors its federal counterpart."
McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 422 (1st
Cir. 2007). Thus, "the MCCCDA should be construed in accordance
with the TILA." Id.[6] Our consideration of Mr. DiVittorio's claim,
therefore, is informed by the TILA.

The TILA designates the Board as the agency charged with
the task of "prescrib[ing] regulations to carry out the purposes of
this subchapter." 15 U.S.C. § 1604(a). "[I]n accordance with 'the
broad powers that Congress delegated to the Board to fill gaps in
the statute,'" Roberts v. Fleet Bank (R.I.), 342 F.3d 260, 265 (3d
Cir. 2003) (quoting Ortiz v. Rental Mgmt., Inc., 65 F.3d 335, 339
(3d Cir. 1995)), the Board has issued an interpretive regulation
governing disclosure provisions, Regulation Z, see 12 C.F.R. pt.

_____

[5](...continued)
Reserve Board . . . has agreed to exempt Massachusetts from certain
portions of TILA-- . . . it is the state's law and regulations that
technically provide the rules to apply to DiVittorio's rescission
claim.").

[6] Indeed, most of Mr. DiVittorio's arguments reference only
the applicable federal authorities.

226. Because Congress has set forth explicitly that the Board and its staff are "the primary source for interpretation and application of truth-in-lending law," Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566 (1980), "absent some obvious repugnance to the statute, the Board's regulation implementing this legislation should be accepted by the courts," Anderson Bros. Ford v. Valencia, 452 U.S. 205, 219 (1981).

The Board also has published an official commentary for Regulation Z. See generally 12 C.F.R. pt. 226, Supp. I ("Commentary"). Generally speaking, "[a]n agency's construction of its own regulations has been regarded as especially due . . . respect." Ford Motor Credit Co., 444 U.S. at 566. "This traditional acquiescence in administrative expertise is particularly apt under TILA, because the Federal Reserve Board has played a pivotal role in 'setting [the statutory] machinery in motion. . . .'" Id. (alteration in original) (quoting Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 315 (1933)); see also Bonte v. U.S. Bank, N.A., 624 F.3d 461, 463 (7th Cir. 2010) (stating that courts "[o]rdinarily[] . . . defer to the Commentary when interpreting TILA and its disclosure requirements").

Moreover, although "[i]t is commonplace that courts will further legislative goals by filling the interstitial silences within a statute or a regulation," there also are times when

"caution must temper judicial creativity in the face of legislative or regulatory silence." Ford Motor Credit Co., 444 U.S. at 565. The Supreme Court explained in Ford Motor Credit Co. that "[m]eaningful disclosure does not mean more disclosure. Rather, it describes a balance between 'competing considerations of complete disclosure . . . and the need to avoid . . . [informational overload.]'" Id. at 568 (alterations in original) (quoting S. Rep. No. 96-73, at 3 (1979), reprinted in 1980 U.S.C.C.A.N. 280, 281). "[S]triking the appropriate balance is an empirical process that entails investigation into consumer psychology and that presupposes broad experience with credit practices." Id. at 568-69. When courts attempt to plug perceived loopholes, their "reparative efforts [could] create confusion and disrupt the regulatory scheme." Benion v. Bank One, Dayton, N.A., 144 F.3d 1056, 1059 (7th Cir. 1998). In this context, "while not abdicating their ultimate judicial responsibility to determine the law, judges ought to refrain from substituting their own . . . lawmaking for that of the Federal Reserve . . . ." Ford Motor Credit Co., 444 U.S. at 568 (internal citation omitted). With this understanding of the statutory and regulatory framework, we turn to the parties' contentions.

**B. Discussion**

On appeal, Mr. DiVittorio first argues that the district court erred in dismissing his complaint. He renews his arguments

-19-

that the APR was calculated improperly, that the failure to achieve the performance-based decrease in interest rate resulted in a higher finance charge than that set forth on the TIL Disclosure and that IndyMac failed to disclose explicitly the schedule for payments, i.e., that they were to be made on a monthly basis. For its part, HSBC maintains that the APR calculation complied with all statutory and regulatory requirements; specifically, it reflects the parties' legal obligations as reflected in the loan documents.

With respect to the summary judgment determination, Mr. DiVittorio submits that the bankruptcy court erred in holding that, by way of the Modification, he waived his rights to rescission. Alternatively, Mr. DiVittorio contends that, even if he waived his right to rescission, this court still must recognize the rescission of his brother and co-mortgagor. HSBC disagrees. It argues that Mr. DiVittorio executed a valid waiver of any rights to rescission that he may have had and, furthermore, that the actions of Mr. DiVittorio's brother are irrelevant to the issues before the court. For ease of reading and analysis, we begin our discussion by considering the parties' waiver arguments.

## 1. Waiver

Mr. DiVittorio contends that, by signing the Modification, he did not waive his rights to rescind the transaction. First, he claims that, because the TILA and the MCCCDA are consumer protection statutes, the rights to rescission

-20-

provided in those laws only can be waived under very limited circumstances, which are not satisfied in the present case. Alternatively, he submits that the policies of the TILA and the MCCCDA would be thwarted by allowing waiver of rescission in these circumstances, especially where, as here, the waiver was not entered knowingly or voluntarily. Finally, Mr. DiVittorio argues that, even if he waived his right to rescission, we still must recognize the rescission of his brother and co-mortgagor.

Turning to Mr. DiVittorio's first contention, he maintains that the TILA and the MCCCDA allow for waiver of the right to rescission only under very limited circumstances. Mr. DiVittorio further argues that, because he did not waive his right under the circumstances provided for in the statute, and in the manner described in Regulation Z, the waiver incorporated into the Modification did not constitute a valid waiver of his rescission rights.

The TILA includes a provision setting forth when a debtor may waive his right to rescission: "The Board may, if it finds that such action is necessary in order to permit homeowners to meet bona fide personal financial emergencies, prescribe regulations authorizing the modification or waiver of any rights created under this section to the extent and under the circumstances set forth in

-21-

those regulations." 15 U.S.C. § 1635(d).[7] The Board has promulgated such regulations, which state in relevant part:

> (e) <u>Consumer's waiver of right to rescind.</u>
> (1) The consumer may modify or waive the right to rescind if the consumer determines that the extension of credit is needed to meet a bona fide personal financial emergency. To modify or waive the right, the consumer shall give the creditor a dated written statement that describes the emergency, specifically modifies or waives the right to rescind, and bears the signature of all the consumers entitled to rescind. Printed forms for this purpose are prohibited, except as provided in paragraph (e)(2) of this section.

12 C.F.R. § 226.23(e)(1).[8]

Mr. DiVittorio maintains that, because he did not establish a bona fide financial emergency in the manner provided in the regulations, he did not waive effectively his right to rescind the transaction. We cannot accept Mr. DiVittorio's argument.

In attempting to rescind the transaction, Mr. DiVittorio

---

[7] <u>See</u> <u>also</u> Mass. Gen. Laws ch. 140D, § 10(d) ("The commissioner may, if he finds that such action is necessary in order to permit homeowners to meet bona fide personal financial emergencies, prescribe regulations authorizing the modification or waiver of any rights created under this section to the extent and under the circumstances set forth in those regulations.").

[8] <u>See</u> <u>also</u> 209 Mass. Code Regs. § 32.15(5)(a) ("The consumer may modify or waive the right to rescind if the consumer determines that the extension of credit is needed to meet a <u>bona</u> <u>fide</u> personal financial emergency. To modify or waive the right, the consumer shall give the creditor a dated written statement that describes the emergency, that specifically modifies or waives the right to rescind, and that bears the signatures of the consumers entitled to rescind. Printed forms for this purpose are prohibited, except as provided in 209 [Mass. Code Regs. §] 32.15(5)(b).").

-22-

was not invoking a "right[] created under" § 1635 of the TILA or under section 10 of chapter 140D. As set forth above, § 1635(d) authorizes the Board to "prescribe regulations authorizing the modification or waiver of any rights created under this section." 15 U.S.C. § 1635(d) (emphasis added). The same is true with the Massachusetts analogue: "The commissioner may . . . prescribe regulations authorizing the modification or waiver of any rights created under this section." Mass. Gen. Laws ch. 140D, § 10(d) (emphasis added). The right created "under this section," 15 U.S.C. § 1635(d), is an unconditional right to rescind "until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms," id. § 1635(a); accord Mass. Gen. Laws ch. 140D, § 10(a). However, the right to rescind created by § 1635(a) expires after three years. 15 U.S.C. § 1635(f) ("An obligor's right of rescission shall expire three years after the date of consummation . . . ."); see also Beach v. Ocwen Fed. Bank, 523 U.S. 410, 419 (1998) ("We respect Congress's manifest intent by concluding that the Act permits no federal right to rescind, defensively or otherwise, after the 3-year period of § 1635(f) has run."). The MCCCDA, which employs the same operative language as the federal statute, see Mass. Gen. Laws ch. 140D § 10(f), and "should be construed in accordance with the TILA," McKenna, 475 F.3d at 422, extends the time for exercising one's rescission rights to four

-23-

years.  Mr. DiVittorio, however, attempted to rescind the transaction more than six years after the consummation of the transaction.  At that juncture, the automatic rescission right under both the TILA and the MCCCDA had long expired.  Mr. DiVittorio, therefore, in attempting to rescind the transaction, was not seeking to exercise a "right created under" § 1635 or section 10 of chapter 140D, and, concomitantly, his ability to waive any rescission right was not cabined by the requirements of 15 U.S.C. § 1635(d) or of chapter 140D, section 10(d) of the General Laws of Massachusetts.

Indeed, both in submissions to this court and at oral argument, Mr. DiVittorio's counsel characterized the right that Mr. DiVittorio was seeking to assert as "rescission in recoupment." Rescission in recoupment is mentioned explicitly only in the TILA, which provides:  "Nothing in this subsection affects a consumer's right of rescission in recoupment under State law."  15 U.S.C. § 1635(i)(3).  The MCCCDA does not mention "rescission in recoupment," but only "recoupment" generally:  "Nothing in this section shall be construed so as to affect a consumer's right of recoupment under the laws of the commonwealth."  Mass. Gen. Laws ch. 140D, § 10(i)(3).  The TILA and the MCCCDA therefore <u>preserve</u> a consumer's right to rescission in recoupment under State law and the laws of the Commonwealth, respectively; however, they do not "create" this right.  Consequently, because Mr. DiVittorio's

-24-

"right" to rescission by recoupment was not created by the TILA or the MCCCDA, the requirements for waiver of unconditional rescission right under those statutes simply do not apply to Mr. DiVittorio's attempted waiver.[9]

Mr. DiVittorio next argues that recognizing his waiver would thwart the policies undergirding the TILA and the MCCCDA. Mr. DiVittorio correctly notes that, although the TILA and the MCCCDA are enforced by individuals, the statutes have broader public policy goals. This is evident from the opening section of the TILA:

> The Congress finds that economic stabilization would be enhanced and the

---

[9] For the same reasons, Mills v. Home Equity Group, Inc., 871 F. Supp. 1482 (D.D.C. 1994), is unhelpful to Mr. DiVittorio. In Mills, the plaintiff had entered a loan agreement on December 20, 1991. Neither at that time, nor at any time thereafter, did she receive several material disclosures under the TILA. Shortly thereafter, the plaintiff fell behind in her payments and entered into a settlement agreement; the settlement agreement included a release of claims under the TILA. The plaintiff later defaulted on the restructured loan. After the defendants instituted foreclosure proceedings, the plaintiff sent the defendants a notice of rescission on June 9, 1994, which was within the three-year statutory time-frame for rescinding the transaction. The district court held that the waiver was ineffectual: "In this case, there was clearly a violation of TILA. Because TILA was violated, Plaintiff had the right to rescind which right cannot be released or waived absent the narrowly drawn circumstances found in TILA for such waiver." Id. at 1486. The Court went on to explain that "Plaintiff was not told she had the unequivocal right to rescind. . . . For there to be any basis to argue that Plaintiff waived her statutorily conferred rights, she would have had to at the least been given the right to rescind and declined to assert it." Id. Thus, in Mills, the plaintiff was invoking her TILA right to rescission within the three-year statute of limitations. This is not the same "right" which Mr. DiVittorio seeks to assert.

-25-

> competition among the various financial
> institutions and other firms engaged in the
> extension of consumer credit would be
> strengthened by the informed use of credit.
> The informed use of credit results from an
> awareness of the cost thereof by consumers.
> It is the purpose of this subchapter to assure
> a meaningful disclosure of credit terms so
> that the consumer will be able to compare more
> readily the various terms available to him and
> avoid the uninformed use of credit . . . .

15 U.S.C. § 1601(a).

Given this public interest, Mr. DiVittorio claims that the principle set forth in Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 704 (1945), should guide our waiver analysis. In Brooklyn Savings Bank, the Court said that

> a statutory right conferred on a private
> party, but affecting the public interest, may
> not be waived or released if such waiver or
> release contravenes the statutory policy.
> Where a private right is granted in the public
> interest to effectuate a legislative policy,
> waiver of a right so charged or colored with
> the public interest will not be allowed where
> it would thwart the legislative policy which
> it was designed to effectuate.

Id. (internal citations omitted). Indeed, the few courts that have considered the issue have looked to the policies underlying the TILA to determine if waivers of TILA rights should be recognized. See Parker v. DeKalb Chrysler Plymouth, 673 F.2d 1178, 1181-82 (11th Cir. 1982) (looking to the rationale of Brooklyn Savings Bank and the policies of the TILA in striking down a general waiver given by a consumer to an automobile dealer); Tucker v. Beneficial Mortg. Co., 437 F. Supp. 2d 584, 587 (E.D. Va. 2006) (stating that

-26-

"[t]he Court looks to Congress' manifested intent in the statute when determining whether a statutory right may be waived" and upholding a waiver incorporated in a settlement agreement negotiated by a state Attorney General on behalf of a class of consumers that the plaintiffs had joined); Johnson v. Steven Sims Subaru, Inc., No. 92 C 6355, 1993 WL 761231, at *5 (N.D. Ill. June 9, 1993) (holding that, in the context of an auto lease agreement, a TILA claim is not barred by a general release procured by a lender from the borrower and explaining that "[t]he underlying policy concerns of TILA preclude defendants from challenging Ms. Johnson's TILA claim with a defense predicated upon a general release of liability").

At oral argument, counsel for HSBC agreed that this principle was applicable to the present case.  However, according to counsel for HSBC, it was unclear how the policies underlying the TILA and the MCCCDA could be thwarted by honoring Mr. DiVittorio's waiver.  Specifically, counsel observed that Mr. DiVittorio's statutory rights already had expired when he signed the Modification, the Modification had been negotiated with the assistance of counsel and the bankruptcy court approved the Modification; consequently, the policies underlying the TILA--ensuring informed decisionmaking for unsophisticated consumers--simply were not at issue.

The waiver of rights under the circumstances presented

here does not "thwart the legislative policy which [the TILA] was designed to effectuate." Brooklyn Savings Bank, 324 U.S. at 704. The TILA was designed to promote a uniform system of disclosures to allow consumers to make informed credit decisions. See generally 15 U.S.C. § 1601(a). Here, the Modification, which included the waiver provision, was the product of lengthy negotiations. In his "Assented Motion of Debtor for Authority to Modify Loan with Ocwen Loan Servicing, LLC" before the bankruptcy court, Mr. DiVittorio characterized these negotiations as "extensive" and noted that they specifically had addressed "the subject original loan documentation including the original note and mortgage." App. 99; cf. Parker, 673 F.2d at 1182 (refusing to recognize waiver where court was "convinced that [plaintiff] was unaware that the release encompassed her TILA rights"); Johnson, 1993 WL 761231, at *5 (noting that "enforcement scheme would be greatly hampered if lenders or lessors were permitted to procure general releases of liability from TILA claims"). Moreover, Mr. DiVittorio was represented by counsel throughout the negotiations leading to the Modification. Furthermore, in exchange for his release, Mr. DiVittorio received a significant reduction in the interest rate over the term of the loan and avoided foreclosure of his property. Finally, the bankruptcy court approved the waiver. Cf. Tucker, 437 F. Supp. 2d at 588 (recognizing waiver when negotiated "by a third party acting in the interests of the borrowers"). We

believe that, given the guidance of counsel, the time for reflection, the reduction in interest rate obtained and the specific approval of the court, the policy concerns of TILA were not frustrated by the waiver provision in the Modification.

Based on the totality of circumstances, we also agree with the bankruptcy court that, as a matter of law, Mr. DiVittorio's waiver was knowing and voluntary. Cf. Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 181 (1st Cir. 1995) ("Generally, no single fact or circumstance is entitled to talismanic significance on the question of waiver. Only an inquiry into the totality of the circumstances can determine whether there has been a knowing and voluntary relinquishment of an ERISA-protected benefit."). Looking to the factors that inform our waiver inquiry, see id. at 181 n.3, we first note that Mr. DiVittorio was not an unsophisticated credit consumer; the present transaction was the thirteenth time that he had refinanced the subject property. Second, the Modification and waiver were the product of eight months of negotiations, during which Mr. DiVittorio was represented by counsel. Third, both the motion to modify filed in the bankruptcy court and the Modification itself explicitly addressed issues related to loan documentation and origination. In the motion to modify, Mr. DiVittorio represented that he had "engaged in extensive negotiations regarding the subject original loan documentation including the original note and

-29-

mortgage." App. 99. Moreover, in the Modification, Mr. DiVittorio explicitly waived any claims "in connection with the making, closing, administration, collection or the enforcement by Ocwen of the loan documents, this modification or any other related agreements." Id. at 106. Finally, he received valuable consideration in the exchange: His variable interest rate of over eleven percent was converted to a fixed rate of seven percent. Given these facts, we believe that Mr. DiVittorio was well apprised of any rights he may have had based on the underlying loan documents--including claims he may have had under the TILA and the MCCCDA--and voluntarily waived those rights in exchange for the significant reduction in interest rate.[10]

Finally, Mr. DiVittorio argues that, even if he waived his right to rescission in the Modification, the bankruptcy court was required to take notice of his brother's rescission. The bankruptcy court concluded that, because Joseph was not a plaintiff in the adversary proceeding, it need not consider the effect of his separate claim of rescission.

Mr. DiVittorio does not directly attack the bankruptcy court's conclusion. Instead, Mr. DiVittorio's argument with respect to the effect of his brother's attempted rescission

---

[10] Mr. DiVittorio argues that, even if he waived his rights as to Ocwen, HSBC was not a party to the Modification, and, therefore, he has not waived any rights vis-à-vis HSBC. This argument is without merit. The Modification expressly defined Ocwen to include HSBC Bank.

includes little explanation and no citation to authority. We regularly have considered such perfunctory arguments to be waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." Id. Nevertheless, this is precisely Mr. DiVittorio's approach.[11]

Even if we were to consider Mr. DiVittorio's claim, it is meritless. As noted previously, the automatic rescission right under the MCCCDA expires after four years. After the expiration of four years, rescission may be obtained only by way of recoupment under the laws of the Commonwealth. See Mass. Gen. Laws ch. 140D, § 10(i). However, Joseph's attempted rescission cannot be

---

[11] The sum of Mr. DiVittorio's argument with respect to his brother's attempted rescission is set forth in three sentences:

> Under appropriate circumstances, a non-party may affect the on-going legal rights or status of a party-litigant by what the non-party does or does not do. This would certainly be the case where either of two individuals had a right to take some action to alter the terms of a relationship which both may have had with a third party. The Debtor submits that Joseph DiVittorio's Notice of Rescission, if otherwise well-founded, resulted in a rescinded transaction as fully, and with the same consequence to the Debtor, as if he had been able to give, and had given, an effective notice himself.

Appellant's Br. 57. Mr. DiVittorio, however, does not offer examples of what might constitute "appropriate circumstances," he does not establish that this is a situation "where either of two individuals" have the right to take some action and he fails to show how Joseph's rescission is "otherwise well-founded."

-31-

considered an action in recoupment.

> A right in recoupment is akin to a defense, which arises
>
> > ["]from some feature of the transaction upon which the plaintiff's action is grounded." <u>Bull</u> v. <u>United States,</u> 295 U.S. 247 (1935). "As developed at common law, the doctrine of recoupment permits the crediting of reciprocal rights against each other where those rights arose under the same transaction, typically the same contract." <u>Mohawk Industries, Inc. v. United States of America</u> (<u>In re Mohawk Industries, Inc.</u>), 82 B.R. 174, 176 (Bankr. D. Mass. 1987).

<u>In re Fidler</u>, 210 B.R. 411, 420 (Bankr. D. Mass. 1997) (parallel citation omitted), <u>vacated in part on other grounds</u>, 226 B.R. 734 (Bankr. D. Mass. 1998). To establish a TILA claim in recoupment, the claimant must show: "(1) the TILA violation and the creditor's debt claim arose from the same transaction, (2) [the claimant] is asserting her claim as a defense, and (3) the 'main action' is timely." <u>Smith</u> v. <u>American Fin. Sys., Inc.</u> (<u>In re Smith</u>), 737 F.2d 1549, 1553 (11th Cir. 1984). In <u>In re Fidler</u>, the bankruptcy court held that, although the debtors in bankruptcy were attempting to assert rescission in an adversary proceeding, the claim nevertheless was "raised . . . defensively in response to [the creditor's] assertion of a secured claim and filing of a motion for relief from stay to foreclose on the Property in the Chapter 13 case." <u>In re Fidler</u>, 210 B.R. at 420. Following this rationale, the bankruptcy court determined that Mr. DiVittorio had raised his claim of rescission as a defense to Ocwen's motion for relief from

-32-

stay.

The same cannot be said of Joseph's attempted rescission. Joseph is <u>not</u> a party to the bankruptcy proceedings, and Mr. DiVittorio has not pointed to, or asked this court to take judicial notice of, any proceedings in which his brother is a party such that Joseph's action could be considered defensive.[12] Mr. DiVittorio has not presented to us any facts that would lead us to conclude that his brother's attempted rescission was a rescission in recoupment. Consequently, because Joseph's attempted rescission is not an action in recoupment, and because the four-year statute of limitations for rescission as of right has expired, Joseph's attempted rescission is time-barred.

## 2. Disclosures

Even if Mr. DiVittorio had not waived his rescission rights when he agreed to the Modification, however, we would

---

[12] Mr. DiVittorio has not argued that a non-judicial foreclosure, without more, constitutes an action to which an individual may raise a TILA rescission claim in recoupment. Indeed, it would appear that such an argument would be unavailing. <u>See</u> <u>Kelly</u> v. <u>Deutsche Bank Nat'l Trust Co.</u>, 789 F. Supp. 2d 262, 266-67 & n.6 (D. Mass. 2011) (distinguishing cases raised in the bankruptcy context and holding that a plaintiff's action for rescission in response to non-judicial foreclosure proceedings did "not assert[] recoupment as a defense," but rather was an "attempt[] to use [recoupment] to obtain affirmative relief (cancellation of his debt)"); <u>see</u> <u>also</u> <u>Ortiz</u> v. <u>Accredited Home Lenders, Inc.</u>, 639 F. Supp. 2d 1159, 1164-65 (S.D. Cal. 2009) (distinguishing bankruptcy cases from this circuit and holding that "non-judicial foreclosures are not 'actions' as contemplated by TILA," and, therefore, rescission may not be asserted defensively in response to non-judicial foreclosures).

conclude that Mr. DiVittorio has failed to state a claim for relief under the TILA or the MCCCDA. Regulation Z requires that "[t]he creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1). Among the disclosures that must be made are the APR, see 12 C.F.R. § 226.18(e), the finance charge, see id. § 226.18(d), and the payment period, see 15 U.S.C. § 1638(a)(6); 12 C.F.R. § 226.18(g). Mr. DiVittorio believes that IndyMac's disclosures were deficient with respect to each of these requirements.

### a. Calculation of the APR

Mr. DiVittorio's primary contention on appeal is that, when HSBC incorporated the performance-based reduction in interest rate into the calculation of the APR, it violated the TILA. The parties agree that the TILA, Regulation Z and the Commentary do not speak directly to this issue. Nevertheless, both HSBC and Mr. DiVittorio point to provisions of Regulation Z and the Commentary in support of their respective positions.

HSBC invites our attention to 12 C.F.R. § 226.17(c)(1). Section 226.17(c)(1) requires that "[t]he disclosures," including the APR, "shall reflect the terms of the legal obligation between the parties." 12 C.F.R. § 226.17(c)(1).[13] According to HSBC, under

---

[13] See also 209 Mass. Code Regs. § 32.05(3) ("Disclosures shall reflect the terms of the legal obligation between the (continued...)

the terms of the note, Mr. DiVittorio was legally obligated to "pay principal and interest by making a payment every month." App. 56. Furthermore, Mr. DiVittorio promised to "make my monthly payments on the first day of each month." Id. If Mr. DiVittorio fulfilled his obligation and made his first twenty-two payments in a timely manner, IndyMac was required to reduce the interest rate by .500 percent. See App. 60 (stating that "the percentage points . . . shall be reduced by .500%"). Consequently, because the APR calculation reflected the legal obligations of the parties--on Mr. DiVittorio's part, to make timely payments, and, on IndyMac's part, to reduce the APR to reflect those timely payments--the disclosure complied with the requirements of Regulation Z.

Mr. DiVittorio acknowledges his "technical[]," "legal obligation to make every mortgage payment on time." Appellant's Br. 37. He maintains, however, that "the lender did not have a legal obligation at that time to utilize the more favorable rate." Id. (emphasis added).

There is nothing in the TILA, Regulation Z, or the Commentary that explicitly addresses whether the APR calculation must reflect performance-based reductions in interest rate. There is no question, however, that, at the time the parties signed the note, IndyMac was legally obligated to reduce the interest rate

---

[13](...continued)
parties.").

following the twenty-second timely payment.  The fact that IndyMac's performance--the reduction of the interest rate--was not yet due does not negate the present nature of its legal obligation. "It is our custom, both juristic and popular, to say that a contract creates rights and duties, even though the performance is not yet due and even though some event must still occur before it becomes due."  8 Catherine M.A. McCauliff, <u>Corbin on Contracts</u> § 30.4 (1999).  Because the performance-based reduction in interest rate was a "legal obligation," IndyMac properly accounted for that obligation in the calculation of the APR as required by 12 C.F.R. § 226.17(c)(1).

Mr. DiVittorio, however, believes that there are other provisions of Regulation Z and the Commentary that, in comparison to 12 C.F.R. § 226.17(c)(1), speak more directly to the issue of whether the performance-based reduction in interest rate should have been incorporated into the APR.  He relies first on the language of the Commentary subsection directed at "<u>Discounted and premium variable-rate transactions</u>," which provides in relevant part:

> When creditors use an initial interest rate that is not calculated using the index or formula for later rate adjustments, the disclosures should reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation.

-36-

Commentary, § 226.17(c)(1)-(10)(i). Mr. DiVittorio correctly points out that this section required IndyMac to state the APR in terms of a blended rate by combining two rates: (1) the initial rate and (2) the "index or formula [rate] <u>at the time of consummation."</u> <u>Id.</u> (emphasis added). Mr. DiVittorio maintains, however, that IndyMac "undermined the formula by introducing another feature"--the performance-based rate reduction--"whose application would turn on circumstances subsequent to the consummation of the loan, not as they existed at consummation." Appellant's Br. 33.

We believe Mr. DiVittorio's arguments fail for several reasons. The phrase on which Mr. DiVittorio seizes--"at the time of consummation"--modifies the terms "the rate that would have been applied using the index or formula." Because a rate based on an index or formula may fluctuate over the course of the loan, it is necessary to tie the calculation to a specific moment in time. Obviously, too, the index or formula rate could not be based on a future date because neither IndyMac nor Mr. DiVittorio could predict accurately whether, when and to what degree the index or formula rate would rise or fall. <u>See</u> App. 38 (ARM Disclosure) (disclosing that "movement of the Index is usually related to market conditions that cannot be predicted"). The FRB, therefore, designated "the time of consummation" as the time for determining the index or formula rate to be incorporated into the blended rate

calculation for the APR disclosure.

Even if the phrase "time of consummation" does not simply dictate when the index or formula rate is to be determined, but applies instead to the entire calculation of the APR, Mr. DiVittorio's argument still fails. As previously discussed, at the time of consummation, IndyMac had a present obligation to reduce Mr. DiVittorio's interest rate following the twenty-second timely payment. Consequently, because this obligation was in effect at the "time of consummation," it was consistent with the blended rate calculation to include the performance-based rate reduction.

However, the most compelling reason to reject Mr. DiVittorio's argument is that the approach taken by IndyMac in calculating the APR--incorporating the performance-based reduction in interest rate--is compatible with the approach set forth in section 226.17(c)(1)-10(i) of the Commentary. This section of the Commentary suggests that the APR should account for changes in the interest rate over the life of the loan. In this case, the variable rate did not take effect until the second year of the loan, see App. 38 (ARM Disclosure) ("Your interest rate will adjust 24 months after the first payment date and every 6 months thereafter to the index value plus the margin . . . ."); nevertheless, the Commentary requires that the change be reflected in the calculation of the APR. Morever, the Commentary requires

that the APR reflect the later change to the variable interest rate even though the index rate in effect during the twenty-fourth month of the loan cannot be known with certainty. In sum, the Commentary attempts to give the debtor a complete picture of the interest rate over the life of the loan based on the terms of the loan documents and the market conditions at the time of the loan.

Incorporating the performance-based reduction into the APR calculation accomplishes this same goal. The performance-based rate reduction is set forth in the loan documents and affects the rate charged for interest after the second year. Its effect, like the index rate, could not be known with absolute certainty. Nevertheless, given the parties' respective promises in the loan document, IndyMac was bound contractually to reduce the interest rate in accordance with those terms. Incorporating that reduction, therefore, gave the debtor a more complete picture of the long-term interest rate and was consistent with the intent of the Commentary.[14]

Mr. DiVittorio next maintains that, because some information on which the APR was based was unknown to the parties, IndyMac was required to calculate the APR "based on the best information reasonably available at the time the disclosure is

_____

[14] Mr. DiVittorio does not argue that IndyMac violated section 226.17(c)(1)-(10)(i) of the Commentary in any other way, such as by failing to use the correct initial rate or by failing to use the index-determined rate at the time of consummation.

provided to the consumer." 12 C.F.R. § 226.17(c)(2)(i). According to Mr. DiVittorio, the best information reasonably available at the time of the loan was that he, as a sub-prime borrower, would not timely make his first twenty-two payments in a timely manner.[15] He concludes, therefore, that IndyMac violated the TILA and the MCCCDA because its calculation of the APR was not based on the best information available.

We believe that the language on which Mr. DiVittorio relies, when read in context, does not apply to the present situation. Section 226.17(c)(2)(i) of Title 12 of the Code of Federal Regulations provides: "If any information necessary for an accurate disclosure is unknown to the creditor, the creditor shall make the disclosure based on the best information reasonably available at the time the disclosure is provided to the consumer, and shall state clearly that the disclosure is an estimate."[16] The

---

[15] The parties spill a good deal of ink on whether Mr. DiVittorio's allegation--that IndyMac "knew or should have known" that subprime borrowers would not make their first twenty-two payments--should be characterized as a factual one, which the district court was required to credit, or a legal one, which the district court was entitled to ignore. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009). This issue only becomes relevant, however, if we conclude that IndyMac was required to resort to the "best information reasonably available." Because we conclude that this language applies only to "estimates," and the calculation of the APR under these circumstances was not an "estimate," see infra at 40-41, we need not address whether this language constitutes a factual or legal allegation.

[16] See also 209 Mass. Code Regs. § 32.05(3) ("Disclosures shall reflect the terms of the legal obligation between the
(continued...)

Commentary further sets forth when estimates may be made: "Disclosures may be estimated when the exact information is unknown at the time disclosures are made. Information is unknown if it is not reasonably available to the creditor at the time the disclosures are made." Commentary, § 226.17(c)(2)(i)-1.

The determination of the APR based on the incentive provision, however, required no further information than what was contained in the terms of the loan. Mr. DiVittorio does not argue that IndyMac could not calculate accurately the impact of the incentive provision on the APR. Indeed, he acknowledges that "the lender knew the precise impact . . . on the interest charged that would have ensued in the event the borrower failed to meet the performance standard." Appellant's Br. 34. Because all of the "information necessary for an accurate disclosure" of the APR based on the performance-based rate reduction in interest rate was available to both parties at the time of the consummation of the loan, resort to "the best information reasonably available" was unnecessary.

Finally, Mr. DiVittorio maintains that, even if the APR were numerically accurate, IndyMac's failure to disclose that the APR was based on the presumption of timely payments "served to mask

---

[16](...continued)
parties. If any information necessary for accurate disclosure is unknown to the creditor, it shall make the disclosure based on the best information reasonably available and shall state clearly that the disclosure is an estimate.").

-41-

the understated APR." Id. at 44. "[A]s so calculated," Mr. DiVittorio continues, the APR was "misleading, and not clearly and conspicuously disclosed." Id. At bottom, Mr. DiVittorio's argument is that, even if the APR is calculated in accordance with Regulation Z and the correct APR is set forth on the TIL Disclosure, the disclosure may nonetheless violate the TILA or the MCCCDA.

Here, Mr. DiVittorio invites us to impose on lenders the requirement that, if they include a reduction-based feature in the calculation of the APR, they must disclose that feature on the TIL disclosure form. This may be a salutary suggestion because it may enhance consumers' understanding of their loan instruments; however, it also may confuse consumers or detract from other disclosures that consumers historically have considered more important than the calculation of the APR. Furthermore, disclosing that the APR incorporates a performance-based reduction may be helpful or important only to certain categories of consumers. In short, determining whether further explanation of the APR calculation should be mandated is an inquiry "that entails investigation into consumer psychology and that presupposes broad experience with credit practices." Ford Motor Credit Co., 444 U.S. at 568-69. Consequently, it is one best left to the FRB "as the primary source for interpretation and application of truth-in-lending law." Id. at 566.

### b. Failure to disclose finance charge

Apart from the calculation of the APR, Mr. DiVittorio believes that the TIL Disclosure here failed to disclose accurately the finance charge.  According to Mr. DiVittorio, the increase in interest rate that resulted from the debtor's failure to make the first twenty-two payments in a timely manner constituted an additional finance charge that the lender was required to include on the TIL Disclosure.  Mr. DiVittorio acknowledges that "finance charges" do not include "[c]harges for actual unanticipated late payment."  12 C.F.R. § 226.4(c)(2).[17]  Nevertheless, he argues that, because IndyMac reasonably should have anticipated that he would make at least one late payment within the first twenty-two months, the increase in interest rate was not "unanticipated," and, therefore, it should not be excluded from the definition of "finance charges."

The Commentary makes clear that any increase in interest rate resulting from Mr. DiVittorio's failure to make timely payments was "unanticipated" and, therefore, properly excluded from the definition of "finance charge."  The relevant portion of the Commentary states:

> 1. Late payment charges.
> i. Late payment charges can be excluded
> from the finance charge under §226.4(c)(2)

---

[17]  See also 209 Mass. Code Regs. § 32.04(3)(b) (excluding from the definition of finance charge "[c]harges for actual unanticipated late payment").

whether or not the person imposing the charge continues to extend credit on the account or continues to provide property or services to the consumer. In determining whether a charge is for actual unanticipated late payment on a 30-day account, for example, factors to be considered include:

A. The terms of the account. For example, is the consumer required by the account terms to pay the account balance in full each month? If not, the charge may be a finance charge.

B. The practices of the creditor in handling the accounts. For example, regardless of the terms of the account, does the creditor allow consumers to pay the accounts over a period of time without demanding payment in full or taking other action to collect? If no effort is made to collect the full amount due, the charge may be a finance charge.

ii. Section 226.4(c)(2) applies to late payment charges imposed for failure to make payments as agreed, as well as failure to pay an account in full when due.

Commentary, 12 C.F.R. § 226.4(c)(2)-1.

The Commentary gives only two examples of when charges for late payment might qualify as a finance charge: (1) when the terms of the agreement do not require full payment by a certain date and (2) when the lender has a practice of allowing delayed payments. That is, when the agreement of the parties or the practice of the lender suggests an understanding to deviate from a regular payment schedule, any fees attendant to the debtor's failure to make regular payments "may be a finance charge."

Here, the legal obligations and expectations for timely payment were clearly set forth in the loan document.

-44-

Mr. DiVittorio does not point to any practice of IndyMac to suggest that late payments were acceptable or that there would not be consequences for late payment. Any additional interest charged, therefore, was "unanticipated" and falls outside the definition of "finance charge."

### c. Failure to specify the payment period

Mr. DiVittorio also argues that IndyMac violated the TILA and the MCCCDA by failing to specify the payment period for the loan on the TIL Disclosure. Mr. DiVittorio notes that, "[w]hile the TILA Statement specified that there would be three hundred and sixty (360) payments over the life of this thirty (30) year loan, it failed to state that there was a monthly payment period, even though there is an explicit requirement in 15 U.S.C. § 1638 (a)(6) that the due dates or payment period be stated." Appellant's Br. 44-45.[18] In support of his claim that this is a violation, Mr. DiVittorio relies on Hamm v. Ameriquest Mortgage Co., 506 F.3d 525 (7th Cir. 2007).

In Hamm, the lender made disclosures with respect to the payment period that are almost indistinguishable from those made here. Specifically, the lender indicated there were to be 359 payments of $541.92 beginning on 03/01/2002, and one payment of $536.01 on 02/01/2032. The form did not specifically state that

---

[18] 15 U.S.C. § 1638(a)(6) requires lenders to disclose "[t]he number, amount, and due dates or period of payments scheduled to repay the total of payments."

-45-

the payments were to be made monthly, nor was there an explicit reference to 360 months. The Seventh Circuit concluded that, because the TILA requires the lender to disclose the "due dates or period of payments scheduled to repay the total of payments," 15 U.S.C. § 1638(a)(6), the lender had committed a "technical" violation of TILA. Hamm, 506 F.3d at 529. It observed "that many (or most) borrowers would understand that a mortgage with 360 payments due over approximately 30 years contemplates a payment by the borrower each month during those 30 years." Id. at 530. Nevertheless, the court's approach required that, "when it comes to TILA, 'hyper-technicality reigns.'" Id. at 529.

However, as Mr. DiVittorio acknowledges, "hypertechnicality" is not the rule in the First Circuit. See Santos-Rodriguez v. Doral Mortg. Corp., 485 F.3d 12, 17 n.6 (1st Cir. 2007). Instead, this court asks, "whether any reasonable person, in reading the form provided in this case, would so understand it." Melfi v. WMC Mortg. Corp., 568 F.3d 309, 312 (1st Cir. 2009). Here, the TIL Disclosure, like the disclosures in Hamm, indicated that there were to be 360 payments spanning thirty years. Like the Seventh Circuit, we believe that a reasonable person reading the TIL Disclosure would have understood that his payments were to be made on a monthly basis. See Hamm, 506 F.3d at 530 (observing "that many (or most) borrowers would understand that a mortgage with 360 payments due over approximately 30 years

contemplates a payment by the borrower each month during those 30 years"); cf. Melfi, 568 F.3d at 312 (holding that lender's failure to fill in the date of the transaction on the notice of rescission rights provided to the borrower did not confuse the borrower because borrower was present at closing and knew the date of the transaction from the date-stamp on the top of the form). Consequently, the form's failure to use the term "monthly" or to refer to the life of the loan over "360 months" does not result in a TILA violation in this circuit.[19]

## Conclusion

For the foregoing reasons, we conclude that Mr. DiVittorio waived any rights he had under the MCCCDA when he signed the Modification. Alternatively, we believe that Mr. DiVittorio has failed to state a claim for relief under the MCCDA. The judgment is therefore affirmed.

**AFFIRMED.**

---

[19] Mr. DiVittorio does not argue that the reasonable person standard used by the First Circuit in interpreting the TILA should not also be used to interpret the requirements of the MCCCDA.

-47-